Jeffrey A. Carr
PEPPER HAMILTON LLP
(A Pennsylvania Limited Liability Partnership)
Suite 400
301 Carnegie Center
Princeton, NJ  08543-5276
(609) 452-0808

*Counsel for Defendants, Semprae Laboratories, Inc.*
*(improperly plead as Semprae Pharmaceuticals),*
*Rachel Scherl, Mary Jaensch, The Jannick Group, LLC*
*(improperly plead as The Jannick Group), Ira Lubert,*
*Quaker Bioventures and Independence Capital*
*Partners, Inc. (improperly plead as Independence Capital Partners)*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| HAROLD P. MINTZ D/B/A ENHANCEMENT ASSOCIATES,<br><br>Plaintiff,<br><br>v.<br><br>SEMPRAE PHARMACEUTICALS, NEW SPRING CAPITAL PARTNERS, ZEV SCHERL, RACHEL SCHERL, MARY JAENSCH, THE JANNICK GROUP, IRA LUBERT, QUAKER BIOVENTURES, INDEPENDENCE CAPITAL PARTNERS,<br><br>Defendants. | CIVIL ACTION NO. _____<br><br><br>**NOTICE OF REMOVAL** |

      **PLEASE TAKE NOTICE** that pursuant to 28 U.S.C. §§ 1446 and 1331,

Defendants, Semprae Laboratories, Inc. (improperly plead as Semprae Pharmaceuticals), Rachel

Scherl, Mary Jaensch, The Jannick Group, LLC (improperly plead as The Jannick Group), Ira

Lubert, Quaker Bioventures and Independence Capital Partners, Inc. (improperly plead as

Independence Capital Partners) (collectively referred to as the "Defendants"), through their

undersigned counsel, and with the consent of all other defendants, New Spring Capital Partners and Zev Scherl (collectively referred to as the "New Spring Defendants"), file this Notice of Removal in the office of the Clerk of the United States District Court for the District of New Jersey.

Defendants, by their undersigned counsel, state:

1.      On June 16, 2010, Plaintiff, Harold P. Mintz, d/b/a Enhancement Associates ("Plaintiff") filed a Complaint against Defendants and the New Spring Defendants in the New Jersey Superior Court, Bergen County, which was docketed as BER-L-5950-10.  A true and correct copy of all process, pleadings and orders, including the Plaintiff's Complaint, are attached hereto as Exhibit A.

2.      This is a civil action over which this Court has original jurisdiction as it arises under the laws of the United States as provided in 28 U.S.C. § 1331.  In particular, Plaintiff presents thirteen counts in his Complaint, including alleged violations of the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1961-1968 ("RICO") and the Hobbs Act, 18 U.S.C. § 1951.  Exhibit A, Complaint at the "Fifth Claim for Relief," ¶¶ 134-141.

3.      On July 6, 2010, Quaker BioVentures was served with a copy of the Complaint.  This is the earliest date any of the Defendants or New Spring Defendants was served or otherwise received notice of the Complaint.  Thus, in accordance with 28 U.S.C. §1446(b), this Notice of Removal is being "filed within thirty days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable."

4.      The New Spring Defendants, through their counsel, Aaron Krauss, Esquire of Cozen O'Connor, consent to Defendants' removal of this action.

-2-

5.      Pursuant to 28 U.S.C. §1446(d), written notice of this removal is being

given promptly to all parties and a copy of this Notice of Removal is being filed with the Clerk

of the Superior Court of New Jersey, Bergen County, Law Division.

Respectfully submitted,


  s/  Jeffrey A. Carr
Jeffrey A. Carr
PEPPER HAMILTON LLP
(A Pennsylvania Limited Liability Partnership)
Suite 400
301 Carnegie Center
Princeton, NJ  08543-5276
(609) 452-0808

*Counsel for Defendants, Semprae Laboratories, Inc.*
*(improperly plead as Semprae Pharmaceuticals),*
*Rachel Scherl, Mary Jaensch, The Jannick Group,*
*LLC (improperly plead as The Jannick Group),*
*Ira Lubert, Quaker Bioventures and Independence*
*Capital Partners, Inc. (improperly plead as*
*Independence Capital Partners)*

Dated:  August 3, 2010

# EXHIBIT A

Harold P. Mintz (Pro Se)
100 Old Palisade Road, PL-14
Fort Lee, New Jersey 07024
Phone: 201-944-7500

**Superior Court of New Jersey**

Harold P. Mintz, d.b.a Enhancement Associates.
                Plaintiff,

Bergen County
Law Division
Docket No: L5950-10 AMENDED

        vs.

Semprae Laboratories Inc., NewSpring Capital
Partners, Zev Scherl, Rachel Scherl, Mary Jaensch,
The Jannick Group, Ira Lubert,
Quaker BioVentures, Independence Capital
Partners

**CIVIL ACTION SUMMONS**

Defendant

From The State of New Jersey To The Defendant(s) Named Above

        The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (The address of each deputy clerk of the Superior Court is provided.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $135 and completed Case Information Statement) if you want the court to hear your defense.

        If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

        If you cannot afford an attorney, you may call the Legal Services office in the county where you live. A list of these offices is provided. If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A list of these numbers is also provided.

Dated 6/30/10

                                                    /S/
                                                    Jennifer M. Perez, Acting Clerk of the Superior Court

Name of Defendant to be Served: Ira Lubert
Address of Defendant: C/O Independence Capital Partners, Inc, Cira Centre, 2929 Arch Street, Philadelphia, PA 19104-3868

NOTE: The Case Information Statement is available at http://www.njcourtsonline.com
Revised 7/1/2008, CN 10792

```
BERGEN COUNTY COURTHOUSE
SUPERIOR COURT LAW DIV
BERGEN COUNTY JUSTICE CTR RM 415
HACKENSACK        NJ 07601-7680
                                        TRACK ASSIGNMENT NOTICE
COURT TELEPHONE NO. (201) 527-2600
COURT HOURS
```

                    DATE:   JUNE 21, 2010
                    RE:     MINTZ VS SEMPRAE PHARMACEUTICALS
                    DOCKET: BER L -005950 10

     THE ABOVE CASE HAS BEEN ASSIGNED TO:  TRACK 2.

     DISCOVERY IS   300 DAYS AND RUNS FROM THE FIRST ANSWER OR 90 DAYS
FROM SERVICE ON THE FIRST DEFENDANT, WHICHEVER COMES FIRST.

     THE PRETRIAL JUDGE ASSIGNED IS:  HON ROBERT C. WILSON

     IF YOU HAVE ANY QUESTIONS, CONTACT TEAM     002
AT  (201) 527-2600.

     IF YOU BELIEVE THAT THE TRACK IS INAPPROPRIATE YOU MUST FILE A
CERTIFICATION OF GOOD CAUSE WITHIN 30 DAYS OF THE FILING OF YOUR PLEADING.
     PLAINTIFF MUST SERVE COPIES OF THIS FORM ON ALL OTHER PARTIES IN ACCORDANCE
WITH R 4:5A.

                    ATTENTION:
                              HAROLD J MINTZ
                              100 OLD PALISADE ROAD FL 14
                              FORT LEE        NJ 07024

# RECEIVED

JUN 1 6 2010

Page | 1

SUPERIOR COURT OF NEW JERSEY
COUNTY OF BERGEN
FINANCE DIVISION

**SUPERIOR COURT BERGEN COUNTY**

# FILED

JUN 1 6 2010

*[signature]*

**DEPUTY CLERK**

New Jersey Superior Court Law Division
Bergen County Justice Center
Hackensack, New Jersey

Harold P. Mintz
100 Old Palisade Road, PL-14
Fort Lee, New Jersey 07024
201-944-7500 Tel.
201-944-7525 Fax

Pro Se

| | |
|---|---|
| Date Filed | 6-16-2010 |
| Payment # | 2069-2069 |
| CA  CK  CC  MO  CG | |
| Amount | 200 |
| Payor | Harold P Mintz |
| Batch/Ref/Case # | 529 |

Harold P. Mintz, d.b.a Enhancement Associates,

        Plaintiff,

    vs.

Semprae Pharmaceuticals, New Spring Capital Partners, Zev Scherl, Rachel Scherl, Mary Jaensch, The Jannick Group, Ira Lubert, Quaker Bioventures, Independence Capital Partners

    Defendants.

Case No.: L-5950-10

COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF AND DEMAND FOR JURY TRIAL; SUMMONS

1. Tortious Interference With Contractual Relations
2. Bankruptcy Fraud
3. Extortion
4. Conspiracy
5. RICO and Hobbs
6. Tortious Interference with Prospective Economic Advantage
7. Intentional Infliction of Emotional Distress
8. Proximate Causation Opportunity Loss
9. Unjust Enrichment
10. Punitive Damages
11. Res Judicata
12. Attorney's Fees
13. Declaratory and Injunctive Relief

## COMPLAINT

Comes now Plaintiff, HAROLD P. MINTZ, d.b.a. ENHANCEMENT ASSOCIATES, LLC, *pro se*, to allege against the Defendants, and each of them, as follows:

## INTRODUCTORY ALLEGATIONS

1.    This action is brought against defendants for damages as well as declaratory and injunctive relief for tortious interference with contractual relations, bankruptcy fraud, extortion,

Harold P. Mintz
100 Old Palisade Road, PL-14
Fort Lee, New Jersey 07024
201-944-7500 Tel.
201-944-7525 Fax

Pro Se

New Jersey Superior Court – Law Division
Bergen County Justice Center
Hackensack, New Jersey

| | |
|---|---|
| Harold P. Mintz, d.b.a Enhancement Associates, <br>         Plaintiff, <br><br>     vs. <br><br> Semprae Laboratories, New Spring Capital Partners, Zev Scherl, Rachel Scherl, Mary Jaensch, The Jannick Group, Ira Lubert, Quaker Bioventures, Independence Capital Partners <br><br> Defendants. | Case No.: L5950-10 AMENDED <br><br> COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF AND DEMAND FOR JURY TRIAL; SUMMONS <br><br> 1.  Tortious Interference With Contractual Relations <br> 2.  Bankruptcy Fraud <br> 3.  Extortion <br> 4.  Conspiracy <br> 5.  RICO and Hobbs <br> 6.  Tortious Interference with Prospective Economic Advantage <br> 7.  Intentional Infliction of Emotional Distress <br> 8.  Proximate Causation Opportunity Loss <br> 9.  Unjust Enrichment <br> 10. Punitive Damages <br> 11. Res Judicata <br> 12. Attorney's Fees <br> 13. Declaratory and Injunctive Relief |

<u>AMENDED</u>

    The cover sheet of this complaint incorrectly listed a defendant as Semprae

Pharmaceuticals instead of as Semprae Laboratories. Defendant was however listed correctly as

Semprae Laboratories in the annunciation of parties section. Accordingly, only the cover sheet

of the complaint has been amended to properly reflect this defendant's name as Semprae

Laboratories.

| 2

## COMPLAINT

Comes now Plaintiff, HAROLD P. MINTZ, d.b.a. ENHANCEMENT ASSOCIATES, LLC, *pro se*, to allege against the Defendants, and each of them, as follows:

### INTRODUCTORY ALLEGATIONS

1.      This action is brought against defendants for damages as well as declaratory and injunctive relief for tortious interference with contractual relations, bankruptcy fraud, extortion, conspiracy, RICO and Hobbs violations, tortious interference with prospective business advantage, intentional infliction of emotional distress, proximate causation opportunity loss, unjust enrichment, punitive damages, res judicata, attorney's fees, and injunctive and declaratory relief for the malicious, unconscionable, and conspiratorial cutting out and of Harold P. Mintz and Enhancement Associates who was a retained investment banker representing Zestra Laboratories, Inc. ("Zestra") for the purposes of finding an acquirer or investor who introduced the defendants to the opportunity which they acted upon successfully and then conspired and collaborated to prevent Mintz from receiving a well-earned success fee. Mintz was compelled to go to Delaware Bankruptcy Court to challenge the Disclosure Statement when he came to understand how defendants were seeking to misuse the bankruptcy court to cram down and launder their misdeeds. Mintz subsequently prevailed in a full adversarial hearing when Chief Judge Carey ruled that Mintz was indeed the retained investment banker to be compensated based on the aggregate purchase price. Defendants are barred by res judicata from relitigating this finding by the Chief Judge.

### JURISDICTION AND VENUE

2.      This Court's jurisdiction is invoked as The Civil Part has jurisdiction over all civil cases where the principal relief sought is legal in nature.

| 3

3.      Venue is proper in Hackensack, New Jersey in that the subject matter of this action arose in this district, because a substantial part of the events and omissions on which the subject claim is based occurred in this district. Plaintiff resides in Fort Lee, New Jersey, and some of the defendants are subject to personal jurisdiction in this district, because of their contacts with and activities in this district.

## PARTIES

4.      Plaintiff HAROLD P. MINTZ ("Mintz") is and at all times herein relevant was a competent adult individual and doing business as ENHANCEMENT ASSOCIATES, LLC ("Enhancement"), a registered New Jersey Limited Liability Corporation.  Plaintiff Mintz is a United States Citizen domiciled in and doing business in the State of New Jersey.

5.      Defendant SEMPRAE LABORATORIES ("Semprae") is and at all times herein relevant is a registered corporation that, amongst other things, was formed for the acquisition of the Zestra product and is focused on women's sexual health.  Defendant Semprae does business nationwide and internationally, with its principal place of business located and headquartered in Saddlebrook, New Jersey.

6.      Defendant NEW SPRING CAPITAL PARTNERS ("New Spring") is and at all times herein relevant was a venture and equity capital provider that trumpets having "significant experience as private equity investors" and continuously and routinely fields business plans and evaluates business opportunities.

7.      Defendant ZEV SCHERL ("Mr. Scherl") is and at all times herein relevant was a senior partner with actual and apparent authority at Defendant New Spring focused on the health care and life sciences industries and the husband of Defendant Rachel Scherl.

8.      Defendant RACHEL SCHERL ("Mrs. Scherl") is and at all times herein relevant

was the wife of Defendant Mr. Scherl, a partner in Defendant The Jannick Group, LLC with Defendant Mary Wallace Jaensch, and is the President of Defendant Semprae, the acquiror of Zestra.

9.      Defendant MARY WALLACE JAENSCH ("Jaensch") is and at all times herein relevant was the partner of Defendant Mr. Scherl, a partner in Defendant The Jannick Group, with Defendant Mrs. Scherl, and the Chief Executive Officer of Defendant Semprae, the acquiror of Zestra.

10.      Defendant THE JANNICK GROUP, LLC/SPARK SOLUTIONS FOR GROWTH ("Jannick") is and at all times herein relevant was the collaboration between Defendants Mrs. Scherl and Jaensch that claims to have provided strategy and marketing guidance and expertise to Fortune 100 firms, including multiple divisions and operating companies of Johnson & Johnson, Wyeth, Deloitte & Touche, GlaxoSmithKline, and Church & Dwight. Defendant Jannick, Defendant Mrs. Scherl, and Defendant Jaensch executed the initial confidentiality agreements with MARTIN G. CROSBY ("Crosby") former CEO of Zestra after Mintz and Enhancement made the introduction of the Zestra opportunity to Defendants New Spring and Mr. Scherl, and in turn to Defendant Mrs. Scherl and Defendant Jaensch.

11.      Defendant QUAKER BIOVENTURES ("Quaker") is and at all times herein relevant was a venture capital firm investing in life science companies.  Defendant Quaker partnered with Defendant Jannick in 2008 to create Defendant Semprae to acquire Zestra and leverage Zestra to build a business focused on developing and marketing women's sexual health products.  On information and belief, Defendant Quaker invested $9 million in Semprae to pursue the endeavor.

12.      Defendant IRA M. LUBERT ("Lubert") is and at all times herein relevant is the

Chairman and Co-Founder of Defendant Independence Capital Partners and a partner in Defendant Quaker. Defendant Lubert was initially complicit (non-feasance) in the misdeeds of Defendants New Spring, Mr. Scherl, Mrs. Scherl, Jaensch, and Jannick, but Defendant Lubert then became aggressively conspiratorial (malfeasance) when he committed extortion and threatened Mintz that he would destroy Mintz's reputation if Mintz took legal action seeking legal redress. Mintz has reported this to the local authorities and the FBI.

13.     INDEPENDENCE CAPITAL PARTNERS ("Independence") is and at all times herein relevant is the umbrella organization headed by Defendant Lubert that Defendant Quaker is part of.

14.     Defendants, and each of them, are at all times herein mentioned collaborators in doing the acts and omissions herein complained of.

## FIRST CLAIM FOR RELIEF

(Tortious Interference with Contractual Relations)

15.     Plaintiff hereby re-alleges and incorporates by reference each and every allegation set forth at paragraphs 1 through 14, above, as though fully set forth herein.

16.     A complaint alleging tortious interference must set forth facts alleging each of the following elements: "(1) plaintiff . . . had a reasonable expectation of economic advantage; (2) defendant . . . interfered intentionally and with malice; (3) defendant's interference . . . caused the loss of Plaintiff's prospective gain; and (4) the injury . . . caused damage." EZ Sockets, Inc. v. Brighton-Best SocketScrew Mfg. Inc., 307 N.J. Super. 546, 558-59 (Ch. Div. 1996) (citing Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 751-52 (1989)). The ultimate inquiry is whether the conduct was both injurious and transgressive of generally accepted standards of common morality or of law. In other words, was the interference by defendant

sanctioned by the 'rules of the game.' There can be no tighter test of liability in this area than

that of the common conception of what is right and just dealing under the circumstances. Not

only must a defendant's motive and purpose be proper, but so also must be the means."Id. at 757

(quoting Sustick v. Slatina, 48 N.J. Super. 134, 144 (N.J. Super. Ct. App. Div. 1957) (citations

and quotations omitted).

17.     During November 2004, Plaintiff Mintz became a Series A investor in Qualilife

Pharmaceuticals, Inc (aka "Zestra").  As an investor, he observed Zestra grow from a little,

Internet-only product company to a company with a product carried on the shelves of over

40,000 stores including those of Walgreens, Wal-Mart, CVS, Rite Aid, Brook/Eckerd, K Mart,

and Target.

18.     In 2007, Zestra became embroiled in a most unsavory battle between Crosby, the

founder of Zestra, and Younis Zubchevich ("Zubchevich"), who was the promoter of the Series

A deal who subsequently became CEO.  Mintz declares the vitriol between Crosby and

Zubchevich was astonishing and the shareholders were encouraged to take sides while watching

their investment become decimated in the wreckage of the battle which somehow commanded

greater shareholder attention than the outrageous mismanagement that had rendered the company

insolvent.  It was one of the most disgusting displays Mintz had ever witnessed.  Until the point

in time when the Crosby/Zubchevich dispute surfaced, Mintz was uninvolved other than as a

passive investor who from time to time received updates.

19.     Mintz's involvement changed at that time when two things became very clear to

him: (i) the divide between these two men was irreparable; and (ii) Crosby, who had ousted

Zubchevich over disappointment with his performance, was struggling mightily to keep his hand

on the tiller in the face of dire economic realities, an attempt by Zubchevich to take over the

company, and the non-stop onslaught that was unleashed by Zubchevich in retribution for Crosby terminating him. After listening to both sides, as both men implored the shareholders to do, Mintz made a decision to support Crosby.

20.    From July of 2007 until approximately September of 2008, Mintz was de facto on call 24x7 as a kind of consigliore to the under-siege Crosby. Mintz has the emails, phone records, letters, etc. to support thousands of hours of effort. As Crosby began hiring other professionals to try to right the rapidly sinking ship, including Jerry Pribanic ("Pribanic") as acting CFO, Mintz realized that he could not do the heavy lifting that he felt was required gratis. This feeling was only reinforced when Zubchevich of all people sent Crosby an email saying he would help but must get paid for the effort.

21.    Accordingly, when Crosby was having difficulty meeting his promises and deadlines to deliver information to the shareholders, Mintz and Enhancement Associates offered to author the Annual Report as a formal consultant. Crosby accepted and Mintz authored the Annual Report and submitted an invoice.

22.    As a confidant and a shareholder, Mintz saw up close and personal as Crosby retained firms such as Sawaya Segalas & Co. ("Sawaya") and Morgen, Evan & Co. ("Morgen") to help him find a white knight acquirer—and Crosby embarked on an array of initial and follow up meetings with a number of prospects. Crosby would continuously report to Mintz and others sanguine and imminent positive results such as in this communication to shareholders: "We are told by the two companies in the "front-runners position" (of the ten that have similar interest), that we are on the cusp of a deal offer within the next few weeks involving a buy-out of the company. One of the front-runner Companies is a large consumer products company with obvious product line synergies and does a lot of business with SmartSource News America

Marketing, along with other NewsCorp media offerings (this was significant as News America Marketing was a significant creditor). The other front runner suitor is a Women's Health pharmaceutical company (sic) extremely strong synergies and is a bit ahead of the consumer products company. The Pharma company offer is expected late next week. Furthermore, an opportunity involving a reverse-merger with a public shell may materialize in the next few weeks. There is also a party interested in securing exclusive rights in China for a $1 million up-front licensing fee that involves Cliff Whitehill-Yarza, former Senior Vice President, General Counsel and Secretary for General Mills, Inc. It is very likely that this China licensing agreement will close within the next few weeks. To gain a better sense of the potential near-term opportunities that are currently in late-stage process, please see the below selected website visitors and related email communications below." But one by one, over several critical months, would-be suitors fell by the wayside. Crosby lost energy and bravado, the Company's already dire financial position deteriorated, and Zubchevich continued his attacks.

23.    Mintz advised Crosby that he must begin to think realistically about bankruptcy, as Zestra was insolvent both in the equity sense and under the balance sheet approach. Mintz explained some of the benefits of bankruptcy to Crosby and introduced Crosby to the sword and the shield metaphors. Mintz also asked Crosby if he would like Mintz to get involved as an investment banker to try and find an investor or acquirer, as Zestra required an immediate white knight. Until that time, Mintz had not engaged in any manner regarding corporate development activities for Zestra. As he did with the writing of the annual report, Mintz made certain that he had a very clear meeting of the minds with Crosby that he would only get involved as an investment banker if he were compensated in the same manner that other advisers including Sawaya, Morgen, Laidlaw (who was involved with the Series B round), and even Zubchevich

would be should there be a successful conclusion. Crosby readily agreed and implored Mintz to start.

24.     As Zestra was insolvent and in tremendous daily distress, there was very little time. But Mintz felt that he might be uniquely positioned to accomplish the task despite the repeated flameouts to date that Crosby presided over. To begin, Mintz was a seasoned investment banker who had developed an intimate understanding of the company over a four-year period, and his insights were enhanced by his continuous advising of Crosby during this most recent very troubled, vitriolic period. Moreover, as the author/developer of the annual report, Mintz had gone through an exercise very similar (nearly identical) to that of developing an "offering memorandum" which an investment banker prepares for use during a client's selling process. Thus, Mintz had the basic tools he needed as well as the ability to present the story/opportunity with a clear delineation of Zestra's strengths and weaknesses. Finally, as a more objective third party, yet someone who had made a bet on Zestra with his own money, Mintz felt he would bring a different level of clarity, objectivity, and credibility to capturing attention and telling the Zestra story—warts and all.

25.     Given the urgency, Mintz quickly realized that a broad "shot gun" approach to multiple prospects was not realistic. Accordingly, he felt the best approach was to try to figure out a win-win fit, via research, before even starting the process. As a number of larger corporations that would normally have been excellent acquirers/partners, including Wyeth and Church & Dwight, were waffling on the opportunity, Mintz thought hard about that dynamic and contemplated that it was just too messy a situation for them to wade into and that the real value would accrue to an acquirer that was ready, willing, and able to muck it out, preside over a reorganization, and one day exit to the likes of Wyeth, Church & Dwight, or Johnson & Johnson.

26.     Mintz used his familiarity with a number of private equity firms, performed research to become better acquainted with a slate of new ones that he was less familiar with, and carefully selected Defendant New Spring as his target and best candidate for four primary reasons: (i) New Spring has two sides of its house—providing growth capital to companies with certain revenue and earnings metrics and focusing on healthcare and life sciences—and Zestra kind of fit up the middle; (ii) Defendant New Spring had a recent high profile success with Nutrisystems which was more of a consumer-type transaction a la Zestra; (iii) Mintz had known Glenn Rieger ("Rieger"), one of Defendant New Spring's partners for approximately 18 years at the time and had recently reconnected socially with Rieger to catch up on several occasions; and (iv) Mintz knew that his approach would be received and taken very seriously because of his past dealings with Rieger.  In fact, Mintz's association with Rieger was a vitally important part of his calculation, as Rieger knew Mintz for many years as the Managing Director of The Platinum Group which had been retained by Safeguard Scientifics a company Rieger had been the Vice President of to work with Safeguard, its portfolio companies, and its funds in consummating deals.  Said differently, Rieger knew exactly what Mintz did for a living and knew that Mintz was an expert in the field and a good adviser.  Importantly, Mintz felt that Rieger was ostensibly an honorable friend.  Thus, Mintz's single-firm targeting of Defendant New Spring was done offensively because he thought it was a great potential fit and defensively as a belt and suspenders approach since he was moving forward quickly and selflessly on a handshake with Crosby and thought it best to deal with people he knew who he thought were honorable.  Importantly, and also part of Mintz's calculation, he had met a couple of Rieger's partners including, Defendant Mr. Scherl, at a cocktail party Defendant New Spring held to celebrate the opening of its new offices.  Defendant Mr. Scherl was one of the leaders of Defendant New

Spring's healthcare practice.

27.     Mintz first introduced Zestra to Rieger and Defendant New Spring on March 18, 2008 via email. The initial stage in getting any deal moving is preparing the right information pieces, executing a classy, professional, well written approach, and diligently and professionally following up. These introductory actions are intended are to engender the requisite interest and mind share in the target audience. This is often not easy and necessitates patience, sticktuitiveness, and, of course, a substantively promising opportunity. Mintz began with an email but knew that he had the classy, well-written 2007 Annual Report he had prepared as well as a variety of other announcements, marketing pieces, and collateral, etc. And, of course he had the product itself that tends to make a good first impression.

28.     Mintz's overture to Rieger was successful, and after a couple of phone calls to better discuss the opportunity, Mintz had Crosby follow up by overnighting to Rieger a full package of materials including sample product. Mintz shepherded the formal introduction stage for about a month, and slowly but surely he started to get sincere interest and traction. Rieger had the opportunity to familiarize himself with the product during a weekend in New York City with his wife (and family). He then sent the materials and remaining samples, with a satisfied smile, to his partner Defendant Mr. Scherl for his thoughts. Mintz began following up directly with Defendant Mr. Scherl at the beginning of April 2008.

29.     On April 7th, Defendant Mr. Scherl emailed Mintz that "I was thinking about it to make (sic) an intro to my wife and her business partner who have related marketing experience and a whole network of contacts in addition to mine." Shortly after receiving that communication, Mintz and Defendant Mr. Scherl had a telephone conversation where Mr. Scherl elaborated and explained that his wife (Defendant Mrs. Scherl) and Defendant Jaensch were

experts and successful professionals in health and well being related consumer products particularly dealing with women and their firm. Defendant Jannick, was a multi-million dollar consulting practice that was retained by major companies including Johnson & Johnson and Wyeth. Defendant Mr. Scherl told Mintz that he wanted to include them in the evaluation. Mintz responded that he thought that would be great. Mintz, Defendant Mr. Scherl, Defendant Mrs. Scherl, and Defendant Jaensch then had several getting to know you calls to get in sync with each other and to better define the opportunity.

30.    Mintz and Defendant Mr. Scherl sought a date for an initial meeting. Defendant Mr. Scherl emailed on April 14, 2008: "It sounds like a mtg over next couple of weeks will be difficult to do in person. Is there a time we can get on the phone this week or early next week to hear the update? Rachel and Mary, can you suggest some times. THX".

31.    On Tuesday, April 15, 2008, a conference call was scheduled for Friday, April 17th, 2008 at 11:30AM. Defendant Scherl served as host: "Pls use my (Defendant New Spring's) call in 866 398 2885, code 491077. Thx". In turn, later on Tuesday, April 15th, 2008, Mintz emailed Crosby: "Martin, We are on for Friday at 11:30 AM. Please use this call in 866-398-2885 Code 491077. Zev Scherl http://www.newspringcapital.com/nsc_team.html#scherl is hosting and Mary Jaensch and Rachel Scherl (Zev's wife) will also be on the call. They are partners at Spark Solution for Growth http://www.sparkgrowth.com/contact_us/contact_us.htm."

32.    On April 17th, 2008, Mintz, Crosby, Zestra Board Member Tony Rascio ("Rascio"), Defendant Mr. Scherl, Defendant Mrs. Scherl, and Defendant Jaensch participated on the conference call. The call was wide-ranging and served as the opportunity for the parties to introduce themselves and establish their respective credentials and for Crosby to give his version of Zestra's state of the state and respond to a whole host of specific questions and queries from

Defendant Mr. Scherl, Defendant Mrs. Scherl, and Defendant Jaensch.

33.      On Monday, April 21st, 2008, Crosby forwarded an email to me that he had sent to Rascio and Pribanic: "Thanks to Hal, we were on a great call with NewSpring Capital on Friday: http://www.newspringcapital.com/nse_team.html#Scherl"

34.      An indication of Defendant New Spring's ongoing interest and desire to better introduce the firm and its capabilities also occurred on April 21st when Jon Schwartz, on information and belief an analyst or associate of Defendant New Spring, emailed Crosby an announcement of Defendant New Spring's investment in York Telecom.  In the world of dealmaking, a tombstone is a powerful sign of can do virility; thus, this was a positive sign and evidenced that Defendant New Spring was interested in Crosby knowing that Defendant New Spring was prolific and had prowess.

35.      On Wednesday, April 22nd, 2008, Mintz spoke with Defendant Mr. Scherl who indicated to Mintz their continued interest but said they had trepidation regarding how messy the state of things was.  Mintz gave a pep talk to Defendant Scherl and once again stressed how: the product was superior; was on the shelves of 40,000 stores; and that $9 million had been invested in getting it to this point over a 5 year period.  Further, a substantial $2 million, FDA-type clinical study had been completed with positive results for both safety and efficacy which was a point of significant differentiation from competitive offerings.  The gist, Mintz explained, was that there was an enormous amount in place and the incredible opportunity (value) would inure to the ones who got their hands dirty and didn't shy away from the clean up.

36.      On Wednesday, April 30th, the same parties to the April 17th conference call (Mintz, Crosby, Rascio, and Defendants Mr. Scherl, Mrs. Scherl, Jaensch) convened at Mintz's conference room at at 100 Old Palisade Road, Fort Lee, NJ for the first full face-to-face.  In the

spirit of never a dull moment, the meeting became rather heated and emotional when Rascio emotionally and vociferously stressed urgency and that an immediate acquisition by a strategic acquirer was the ONLY viable option, basically indicating that this meeting was totally unrealistic and unproductive. As the banker shepherding this new relationship, Mintz was pretty appalled by Rascio's behavior and directly questioned/challenged him. Rascio proceeded to have a temper tantrum in front of all of the attendees and asked out loud if Mintz wanted him to resign from the Board. All in all, it was not the best first impression but did serve to reinforce Zestra's true state of the state.

37.     For approximately the next month, information exchanges occurred and Crosby and Defendant Mr. Scherl, Defendant Mrs. Scherl, and Defendant Jaensch advanced their relationship with the Company and the process. At some point, Defendant Mr. Scherl informed Mintz that his wife, Defendant Mrs. Scherl, and Defendant Jaensch were so excited about the opportunity that they were considering leaving their consulting practice to pursue this full-time. Taking Defendant Mr. Scherl at his word, the fact that Defendants Mrs. Scherl and Jaensch were now considering leaving their multi-million dollar consulting business to pursue Zestra full-time was a strong indicator that these well-educated, industry knowledgeable experts were beginning to appreciate that this could be a significant opportunity! However, Defendant Mr. Scherl once again postured that they were all pretty spooked by how messy it was and weren't certain whether they wanted to deal with all of the muck.

38.     On Tuesday, May 6th, 2008, Defendant Mrs. Scherl emailed Crosby: "I hope this finds you well. I left you a voicemail late in the day today. Mary and I remain very interested and are putting together a list of information needs and questions as we learn more. We are meeting with a lawyer tomorrow on this to get smarter as quickly as possible. Might you have

some time on Friday morning to walk through some of the questions with us?  Please let me know."

39.    On Wednesday, May 7, 2008, Defendant Jaensch emailed Crosby: "Martin – Thanks so much for sending all of the Zestra documents.  We are busy going through them and hope that we might schedule a call with you for Friday at 10:30 am.  Will that work for you?  Have a good day.  Mary & Rachel"

40.    On the morning of Friday the 9th, 2008, Mintz emailed Crosby to make sure he was prepared and wish him good luck on the call: "Good Luck w/ R&M  Actually…Repairs and Maintenance might not be a bad metaphor."  Mintz also reminded Crosby of a 2:00 call they had scheduled for that afternoon.  Later in the day, Crosby wrote to Mintz: "It went very well with R&M."

41.    On Monday, May 12th, 2008, in response to Defendant Jaensch's emailed question, Crosby informed her and Defendant Mrs. Scherl that they they did not need to get specific written consent for their presentations to other funding groups, as long as those discussions "relate to future funding considerations for a Zestra transaction, loan or capital investment, (Crosby) would consider it to be part of the evaluation of confidential information for the project(s)."

42.    On Tuesday, May 13th, 2008, Defendant Jaensch emailed Mintz and Cc'ed Defendant Mrs. Scherl and Defendant Mr. Scherl: "Hal – Rachel and I want to thank you again for setting up the meeting in Ft. Lee with Martin Crosby a couple of weeks ago and to update you on our current activities.  We are very excited about working to raise another round of funding to support a more effective program that can build Zestra to what it should be – a significan player in women's OTC health care.  In fact we are signing a CDA with Martin today

and beginning to schedule VC meetings, starting next week.  Thanks again for the introduction.  Regards, Mary & Rachel."

43.    On May 15, 2008, Crosby emailed Mintz: "Hal, Jerry, Tony and I have a 2pm meeting on Tuesday with CCA Industries in East Rutherford. Please see this link for information: http:/finance.yahoo.com/q/pr?s=CAW  Calling you later this afternoon.  Also, while we are in the area, (*Jerry and I*) could leave Wednesday morning open to meet regarding the anticipated LOI form (sic) SPARK..."

44.    On Friday, May 16th, 2008, Mintz was Cc'ed on a communication initiated by defendant Jaensch saying: "Martin - Wednesday morning is good for us.  We could meet anytime between 9:00 am and 12:00 pm.  Do you have a place to meet or should we find a meeting place?  Where will you and Jerry be staying Tuesday night?  We have an appointment next Thursday with a VC and are pulling a presentation together.  It would be very helpful if you could send us either the most current (April 30, 2008) Accounts Payable Trial Balance or the Aged Accounts Payable.  We are looking forward to see you and meeting Jerry next week.  Have a great weekend.  Regards, Mary."  Mintz noted two things with this communication: (i) Defendants Jaensch and Mrs. Scherl were continuing to move forward; and (ii) they did not Cc Mintz on this communication or thereafter.

45.    On Wednesday, May 21st, 2008, Crosby and Pribanic met with Defendant Mr. Scherl, Defendant Mrs. Scherl, and Defendant Jaensch, at Defendant New Spring's conference room at 101 JFK Parkway, 4th Floor, Short Hills, NJ.  Later that day, Crosby sent Mintz an email: "Hal....thank you....very promising meeting with Rachel, Mary and Zev...on the way to airport now....Martin".  That evening, after a call between Mintz and Crosby, Mintz emailed Crosby to "Please be careful...It's too early to be an open book."  Crosby responded: "Yes.  You

and Jerry are the restricted circle."

46.     On May 22, 2008, Crosby sent an email with the subject "Zestra – Follow-up to yesterday's meeting and recent website visitors of note" to Mintz and Defendant Mr. Scherl, Defendant Mrs. Scherl, and Defendant Jaensch with a Cc to Pribanic: Dear Rachel, Mary & Zev: Jerry and I very much enjoyed our very productive meeting with you yesterday. Thank you for all of your homework on the Zestra opportunity and we are delighted that you share the vision of what Zestra can become in the right hands.  Talk you soon.  All the best, Martin".

47.     On May 26, 2008, Crosby sent Mintz in red and underlined with a Cc to Pribanic: "Hal, You and Jerry are the only people receiving this as my initial concept of a possible shareholder communication....Best....Martin".  In the proposed communication, Crosby set out that there were eight (8) pharmaceutical and consumer product companies that Zestra was in discussions with under Confidential Non-Disclosure Agreements (CDA's) where five of the eight had a consumer products division in North America and two of the eight had global consumer products dividions.  Crosby stated further that "all of the interested companies are requiring either an 'asset-purchase' or 'licensing deal' due to repetitive legal assaults against the company by a shareholder..."  Crosby also included: "Venture capital financing combined with experts in Women's Health and consumer product marketing as the executives leading the company to greater sales and shareholder value with the goal of a properly timed exit to maximize the Zestra brand opportunity and thus shareholder return."  That Crosby was preparing to present this as part of a shareholder communication was very positive to Mintz as it meant that things were moving along quite smoothly with an increasing probability of occurrence.

48.     In an email Mintz received from Crosby, on May 27, 2008, Crosby informed Mintz: "Hal, Zev asked Jim Ratigan ("Ratigan"), the CFO with one of Zev's (Defendant New

Spring's) companies (Nitric Bio) that they (Defendant NewSpring) financed to join our NJ meeting with Rachel, Mary and Zev last Wednesday by phone. Despite being on vacation and traveling, Jim had likewise done his homework on Zestra and had a lot of great questions. See Jerry's additional responses to the questions asked by Jim. Also, here's Jim's ZoomInfo backgrounder: http://www.zoominfo.com/Search/PersonDetail.aspx?PersonID=5470716&searchSource=basic_ ssb&singleSearchBox=James+A.+Ratigan&personName=James+A.+Ratigan.   Hal, they have the right stuff indeed. Best, Martin". Included in Crosby's email was a series of responses structured in a Q&A type format and 5 schedules (including a capitalization table) that were sent by Pribanic directly to Ratigan.

49.      In 20:20 hindsight, Mintz feels this may have been the first signs of Defendants' "screw the banker" charade as it was at this juncture, that Mintz began to notice a disconnect between communications and deeds. In this case, Defendant Mr. Scherl was continuing to express uncertainty to Mintz, yet he was involving executives from other of Defendant New Spring's portfolio companies in far more advanced due diligence efforts without disclosing same to Mintz.

50.      On May 27, 2005, in addition to the Q&A exercise, Pribanic sent to Ratigan: "Jim, Attached is the list of outstanding obligations as of 5-21-08 along with copies of the notes. The note entitled Roy Pfauch is the convertible debt.   Regards, Jerry"   Ratigan was clearly vetting Zestra's financial position for Defendant New Spring.

51.      Also, on May 27, 2005, Defendant Jaensch sent an email to Pribanic and Ratigan Cc'ing Crosby: "Jerry - thanks so much for getting all this information to Jim and us so promptly."   Mintz took note that defendants were continuing to advance things without keeping

Mintz in the loop (i.e., not calling or Cc'ing him). In Mintz's estimation, the defendants were so self-centered, it didn't occur to them that Crosby was running most everything by Mintz and Mintz, as a skilled investment banker, was keeping his hand on the tiller, just in case problems should emerge.

52.     Later, on May 27, 2008, Crosby sent Defendant Mr. Scherl, Defendant Mrs. Scherl, Defendant Jaensch, and Mintz an email: "Hi Rachel, Mary, Zev and Hal: Copy fyi." and an article entitled "No Fem-agra" that had appeared in the Indianapolis Star that said "a decade after Viagra, there's no equivalent for women". The article also stated that "some options already exist, such as Zestra, an over-the-counter topical product made of natural oils that's billed as a female arousal fluid."

53.     On Wednesday, May 28, 2009, Crosby sent an email to Defendant Mr. Scherl, Defendant Mrs. Scherl, and Defendant Jaensch with the Subject: Request for Status Update with Spark and NewSpring. He wrote: "Mary, Rachel and Zev: Let's schedule a conference call to update each other about recent events and progress. Best regards, Martin". Among other things, this evidences how much Defendant New Spring was still intimately involved.

54.     Later on that May 28, 2009 evening, Mintz observed the increasing 'warm fuzzies' amongst the principals developing when Crosby signed off a 10:30PM email to defendants "Thanks and sleep well" and Defendant Jaensch responded "Martin – sleep well too!"

55.     On Friday, May 30, 2008, Jon Schwartz of Defendant New Spring sent another tombstone announcement to Crosby where Defendant New Spring announced the recapitalization of Precyse Solutions. Once again, Defendant New Spring wanted Crosby to be impressed by the firm's activities.

56.     On May 29th, 2008, Mintz sent a note to Crosby "I did speak with Zev. I also put

a call into Mary and am working on an email." Mintz was working on an email because he felt it important to exhort and cheerlead—likely because he was not receiving properly communicative or candid communications from Defendant Mr. Scherl, Defendant Mrs. Sherl, and Defendant Jaensch.

57.     Mintz spent the day working on a cute but very powerful email to Defendant Mr. Scherl, Defendant Mrs. Scherl, Defendant Jaensch, and Rieger using the metaphor of buried treasure and advising that so much of the Zestra opportunity came from the fact that it was in disarray and undervalued and that the rewards would come from working through the messy situation. Mr. Scherl emailed back to say that "You and I are on the same page" and "By the way I am following up with glenn (Rieger of Defendant New Spring) also…fyi. Z".

58.     In late May/early June, everyone was on board and the process accelerated. Defendant Mrs. Scherl and Defendant Jaensch got permission from Crosby to share information with other possible funding sources and they developed a brief summary and more detailed investor presentation. They also began meeting with bankruptcy counsel and other related experts. Mintz was very pleased that his hard work seemed to be achieving results and was positively moving forward. He let all parties know that he was available and to let him know if there was anything he could do at any time to assist and he took a back seat.

59.     On June 2, 2008, Mintz observed how Crosby was fully embracing defendants and sharing with them intimate Zestra contacts and relationships. So, for example, Crosby made a direct introduction to Dr. David Ferguson, an expert in sexual medical research and a primary doctor and researcher in Zestra's FDA-type clinical trials to demonstrate the product's safety and efficacy. Defendant Mrs. Scherl emailed Crosby: "Martin-Thank you so much for connecting us with Dr. Ferguson. We spoke to him at length this afternoon. He is as brilliant and accessible as

you indicated. He was very generous with his time and expertise. The call was extremely productive. Thanks again. We will talk to you soon. Regards, Rachel"

60.     On June 12, 2008, Crosby emailed Mintz to indicate his excitement with how things were progressing and give thanks for finding a white knight and helping orchestrate the reorganization strategy: "*Hal, Spot on work sir! Martin*"

61.     On June 26, 2008, Mintz emailed Crosby: "Did we file? Any updates?" and Crosby emailed Mintz to let him know that the bankruptcy filing had occurred: "Everything on go! I'll call you tonight."

62.     Mintz states as an expert investment banker that he has been involved in a multitude of deals during his career, and the role of the intermediary is an interesting one. On the one hand, the intermediary needs to be incredibly knowledgeable about the opportunity and both sides' interests and their respective hot and cold buttons, and the intermediary needs to be available 24x7 as banker, shrink, lawyer, adviser, confidant, and communicator—often for both buyer and seller—to get the process rolling and the parties in sync. On the other hand, at some point, the intermediary must fade back and allow the principals to get to know each other directly, allow them to get granular, and make way for a new set of professionals including staff and lawyers, accountants, and other professionals on both sides to do their thing, and ultimately hope that the deal parameters and professional chemistry work and the deal gets completed. This is always an adjustment period as it is a real and emotional handoff and egos must be subsumed. The extent to which the intermediary takes a back seat varies from deal to deal based on how smooth things are going as well as the principals' needs and desires, and the successful consummation of a win win transaction (the greater good) hopefully ensues.

63.     So, in keeping with this natural progression, Mintz took a position as the behind

the scenes monitor and confidant for Crosby receiving upwards of 10 communications a day as things progressed. Mintz was aware that he had selflessly taken this on without exclusivity and with a fee contingent entirely on a successful outcome. However, Mintz, as a washed out Series A shareholder, was very cognizant of and sympathetic for how injured his fellow shareholders were and how they had been put through the ringer by Crosby and Zubchevich. He also knew that creditors were lined up a block long. So, Mintz, being selfless, wanted to have a light touch, although he knew that he had put something potentially very positive in motion. He of course was rooting for the defendants' successful completion of a transaction, as it was the only way he would earn his fee, but he was simultaneously aware that a deal is never a deal until it's a deal and that other prospective acquirers were still making inquiries. As examples, Crosby sent Mintz emails indicating ongoing acquisition discussions with Alaven, Ascend, CCA Industries, PharmaScience, Joddes Ltd, and Church & Dwight among others. In fact in one communication from Crosby to Morgen that Crosby sent to Mintz, Crosby states: "Church & Dwight's delay was only that the CHD internal M&A team members were sidelined for a bit with the OraJel acquisition and spring vacations immediately afterwards…Tony Rascio & I had a fantastic lengthy call with Brian yesterday morning and <u>Zestra is on the entire team's front burner at CHD.</u>"

64.     Mintz, as an expert states, the interesting and dangerous thing about being a success-based/all-or-nothing investment banker/intermediary is that, when it's all said and done, unless a deal is consummated, the deal maker is 100% at risk. Many professionals including CPAs, attorneys (who generally are paid hourly), and venture capitalists (who receive substantial management fees) are insulated from this dramatic risk reward situation. To continue Mintz's thought, at any point in the process another suitor could have emerged, made a better offer, and

rendered all of Mintz's efforts meaningless…at least compensation-wise. For example, one of the companies Crosby had met with could have stepped forward and made an offer; or validating at least some of his non-stop outrageousness, Zubchevich could have led a group with a better offer. Said differently, at any time, other parties, including major consumer products companies, or other suitors fronted by the likes of Morgen, Laidlaw, or Zubchevich could have offered a better deal for Zestra. Mintz, out of respect, felt that he had done a very positive thing on both sides and let it move forward. While, he recognized in July that defendants were being less than forthcoming, Mintz knew that his investment banking efforts are frequently front-end loaded and that he could not earn his fee unless and until defendants closed the deal. As a skilled banker, Mintz respected the principals' right to control the process particularly after observing how they were not Cc'ing him or asking him to participate in all the activities. Mintz was also able to finally shift his focus, as he had significant personal and professional activities that required his immediate attention. Moreover, Mintz was glad to have a respite from what had been an absolutely unsavory year in the vitriolic Zestra trenches.

65.     On June 29, 2008, Crosby forwarded to Mintz an email from Chun I. Jang of Richards, Layton & Finger, P.A. with two letters regarding the Zestra's official bankruptcy filing and the beginning of the automatic stay.

66.     Later, on June 29, 2008, Crosby emailed Mintz: "Hal, Still signing stuff for the moment…will call ASAP. **You are my hero!**" Mintz was very pleased for the ringing endorsement and he was proud of his efforts in helping orchestrate the bankruptcy and bringing in a white knight acquirer.

67.     On or about July 1, 2008, Mr. Rieger and Defendant New Spring, Defendant Mr. Scherl, Defendant Mrs. Scherl, and Ms. Jaensch determined to move forward, phase out

communication with Mintz, and pretend that they had no obligation to him. In parallel, they systematically set about silencing Crosby threatening him with his job, etc. should he take sides or even be in touch with Mintz. The communication drop off between Mintz and Crosby was immediate, clear, evident, and documented demonstrating the effectiveness of the threats.

68.     Mintz had been there for Crosby and Zestra non-stop for a solid year and had just been called "hero" by Crosby, so when Mintz began to get bad feelings sensing something less than honorable was afoot, he reached out to Crosby as well as to Defendant Mr. Scherl, Defendant Mrs. Scherl, and Defendant Jaensch. All of them made themselves scarce. Mintz began to cry foul. In parallel, however, he recognized he wouldn't earn his success fee unless the transaction closed.

69.     But Mintz was irritated, and felt defendants behavior had now become dishonorable. On August 3rd, 2008, Mintz submitted an up-dated invoice for $129,500 for: SERVICES RENDERED FROM: July 1, 2007 through February 29, 2008 No less than 10 hours/week by 4 weeks/month by 8 months @ $300/hour...the writing and and delivery of the Zestra Laboratories, Inc. 2007 Annual Report...and 2 trips to Charleston to help ensure the success of 2 critical Shareholder Meetings." This invoice was submitted as a "sending the message" replacement for the earlier invoice that was just for the annual report as Mintz wanted to clearly lay out how much time he had invested in the success of Zestra.

70.     Neither Defendants nor Crosby ever responded to Mintz's action. Defendants were backhandedly sneering. That said, the Defendants were clearly on notice that Mintz was aggrieved.

71.     On August 21, 2008, Mintz received a message from Crosby applauding Mintz for standing up for his rights. The message was also significant as it echoed what Crosby had

told Mintz later that evening   that he was unable to speak openly under the circumstances. The note stated: "Hal…….Powerful stuff you are! I'm still *a* the office. I'll call you tomorrow when I can speak freely."

72.     Mintz did finally speak with Crosby and Crosby stated that he was being threatened and controlled. He told Mintz that defendants took away his cell phone and his corporate car and that he was on a terminable corporate consulting agreement and that he needed to protect himself as he had his wife and young son. Crosby did not have the character, stomach, or financial self sufficiency to oppose these incredibly rich, in control bullies. And this was after Crosby had recently called Mintz "my hero" in an email.

73.     During one of Mintz' final conversations with the threatened and muzzled Crosby, Crosby said that Defendant Mrs. Scherl had told Crosby to suggest that Mintz contact Rieger at Defendant New Spring. Accordingly, on 10/23/08, Mintz fedexed a letter to Rieger where he laid it out: (i) Mintz had introduced to him and Defendant New Spring ("nicely teed up") on March 18th, 2008 what Mintz thought was a great opportunity for Rieger and Defendant New Spring; (ii) he had laid out the good, bad, and the ugly with Zestra but felt strongly that the upside strongly outweighed the negatives, particularly with the opportunity to come in and restructure things; (iii) Mintz had carefully selected Rieger and Defendant New Spring for substantive reasons as well as Mintz's long-term association with Rieger; (iv) Mintz had shepherded this along and Rieger's partner, Defendant Mr. Scherl, had indeed seen the promise and had brought his wife Defendant Mrs. Scherl, and her partner Defendant Jaensch into the equation; (v) Defendant Mrs. Scherl and Defendant Jaensch were apparently leaving their multi-million dollar a year consulting practice to pursue this full-time; (vi) a very low percentage of the deals Defendant New Spring looks at, get done — and this one was apparently going to get

completed; (vii) on the one side, Mintz was engaged by Crosby, on the other Mintz made an introduction to people who he felt had character and who knew exactly what Mintz did for a living ("said differently Glenn, I brought this to you"); (viii) that Rieger was aware that Mintz was being stiffed and that this was beyond professionally insulting; (viii) Mintz had given them unfettered access and not sought to create an auction; and finally (ix) Mintz stated in the letter: "This is a tricky time in the world and character is going to be a more important attribute than ever.  Please do the right thing by me.  I detest bullies and I detest sneaky stuff and I'm an expert at this (you know I am) and will do whatever I need to do…to be properly compensated for engineering what I hope is a very successful deal…"

74.     Rieger did call Mintz but only to declare that "he knew nothing!"  Mintz declares this may be hysterical comin from Seargent Schultz in *Hogan's Heroes* but it was unconscionable and a complete embarrassment coming from Rieger, a professional dealmaker as well as someone who morally owed a duty of fair dealings to Mintz.  Rieger went on to tell Mintz that Defendant New Spring did not have a seat on Semprae's board or some such nonsense.

75.     Philosophically and as a matter of policy, this is shameful, and must not be allowed.  If someone approached Walt Disney with a script or project, Disney goes through legal convulsive gesticulations to protect itself from being accused of stealing ideas.  This situation is the contrapositive.  A deal opportunity was brought to a professional venture capital group who knows exactly what Mintz does for a living.  Their attempt at playing a spousal shell game by which passing off management to a single partner (Defendant Mr. Scherl) and his wife (Defendant Mrs. Scherl) and her partner (Defendant Jaensch), and getting good ole boy private equity partners involved (e.g. Defendants Lubert, Quaker, and Independence) somehow breaks

the chain of responsibility and obligation is absurd. Wives of partners are pretty easy. Does the Court really want to get into the game of evaluating whether sneakily spinning a deal off to a firm partner and his wife exonerates a firm? How about a partner, 2 cousins, and a dog? This subterfuge doesn't even pass the red face test. Defendant Mr. Scherl, a senior partner at Defendant New Spring, his wife, and other associated cronies did something they feel would benefit them enormously and the lead came to them after Mintz, the retained banker, had introduced it to them.

76.     Up until the end of May 2008, Crosby was still asking for a status update from Defendant New Spring indicating Defendant New Spring's continued involvement. And into June 2008, Defendant New Spring was sending deal announcements to Crosby, asking Ratigan, one of Defendant New Spring's portfolio company's CFOs to participate in due diligence efforts, and using Defendant New Spring's conference room facilities for meetings. Whether Defendant New Spring decided to do the deal directly or not because of a nepotism conflict of interest when Defendant Mrs. Scherl and her partner Defendant Jaensch wanted to run the business is irrelevant, although query whether given that they thought the opportunity was so good, they did something disreputable vis-a-vis Defendant New Spring's limited partners who may or may not have been informed about the opportunity and invited to participate. It is Defendant New Spring's absolute obligation to make sure that things are in place with an introducing party versus participating in shell games and obfuscation. This behavior was embarrassing in its egregious nature and unconscionability.

77.     Moreover, Mintz declares it is not a difficult leap to conclude that in the luxurious ranks of the private equity ole boys club that one hand washing the other is worth an awful lot. Said differently, at the lowest level, Defendant New Spring benefitted enormously in terms of

good will and ole boy network points in bringing in Defendant Quaker. On information and belief, Mintz states, when we apply greater scrutiny, an assortment of opportunities the two firms have evaluated in conjunction as well as investments made in each other will likely be found. Mintz also states on information and belief that Defendants Mr. Scherl and Mrs. Scherl approached other partners, spouses, and staff of Defendant New Spring to see if they wanted to directly invest.

78.    Mr. Mintz also states on information and belief that when it is looked into more closely that there are likely a whole host of other deal makers who have been stiffed by Rieger, Defendant Mr. Scherl, Defendant New Spring, Defendant Lubert, Defendant Quaker, and Defendant Independence who would be desirous of joining a cause of action.

79.    Mintz did not officially learn that the deal was a fait accompli and defendants had prevailed until he received the Disclosure Statement for Debtor's Chapter 11 Plan of Liquidation (the "Disclosure Statement") dated February 6, 2009. The only reason Mintz received the Disclosure Statement was that Enhancement had submitted an invoice long before when Mintz had written Zestra's annual report. As soon as Mintz read the Disclosure Statment, he became appalled at the extent of defendants' deceit. Most glaring to Mintz was that he suddenly understood defendants' mens rea and actus reus: they had decided to cleverly and callously freeze Mintz out, simultaneously silenced Crosby, and then controlled the entire bankruptcy process and sought to cover their tracks by using the bankruptcy court as a deadline and smokescreen knowing that Mintz did not have a written agreement. Aside from being completely dishonorable, their tactic was not shrewd or sound business strategy demonstrating Baker Scholar business acumen. Instead, it was bankruptcy fraud and conspiracy (discussed more below). Moreover, it was complex fraud as differently situated defendants had

collaborated to perpetrate this theft. The receipt of the disclosure statement jolted Mintz and viscerally he recognized that challenging the veracity of the disclosure statement was vitally important.

80.     In the Disclosure Statement, Mintz's or Enhancement's name or existence never appeared, and defendants and had never disclosed this material claim. Instead, defendants fraudulently stated and signed off that there was "no broker" in the transaction knowing full well that there was one—Mintz. Further they concocted a fiction that appeared in the Disclosure Statement: "Prior to the Petition Date, one of the directors on the Debtor's board contacted Quaker BioVentures and inquired about its interest in the Debtor's estate." This was outrageous when Mintz had all of the documentation evidencing that he had made the introductions rather than a fictional director on debtor's board as per the Disclosure Statement.

81.     But the bigger, broader, more ominous universal message from these master of the universe lying bullies was 'Tough..We've screwed you...And there's nothing you can do about it' as they metaphorically kicked at least a quarter of a million dollars of, up front (based on the purchase price), sand in Mintz's face. And, as discussed below, the expectation (compensatory) damages they inflicted based on the well known, industry standard success fee formula tied to aggregate consideration paid by the buyer and frequently options to boot was far far greater than that. They had stolen, a well earned fee that would rise to $640,000 even without options (8% x $8 million potential aggregate consideration), and with successful performance and options, Mintz's fee could have approached $1 million. In addition to stealing a well earned fee, they robbed Mintz, who is an entrepreneur of the ability to fund going concern and growth activities, as well as of the pride and contentment that comes from a job well done.

82.     In parallel with determining how to challenge the Disclosure Statement, Mintz

was, for all intents and purposes, begging defendants to do the right thing. He truly did not want to stand them down in the school yard and punch them in the face. The victim of terrible bullying is often traumatized and embarrassed by his or her predicament with the result being anger, depression, and paralization. And Mintz was suffering all of these things. Mintz wrote to defendants stating: "If someone had introduced an opportunity to Mintz that he thought had so much merit and potential that his wife and her partner would abandon their multi-million dollar consulting practice to pursue full-time, he would have sent the intermediary thank you notes, flowers, and, of course, been delighted to pay his or her fee. Yes this is the truth, not lip service... Defendants' malfeasance and nonfeasance are unconscionable and demonstrate a haughty 'I am above this' approach that always sucked but sucks even more in these very trying times." Mintz implored defendants to do the right thing or he would avail himself of the full power of the law to right this terrible wrong.

83.    During the bankruptcy process, defendants had a legal and moral obligation to Mintz which they elected to cavalierly and unconscionably disregard. Moreover, defendants wrongfully threatened and silenced Crosby, the true manager of the debtor, to ensure their control and thendrove the entire process as the de facto debtor-in-possession (e.g., the Disclosure Statement's Section II C. Summary of Prepetition Indebtedness and Prepetition Financing states "The Debtor's only prepetition secured debt was for $30,000 and was owed to Jannick, the Debtor's DIP Lender..."). Said differently, defendants advanced the money and controlled the entire process. And, defendants knew everything about Mintz as well as his displeasure, however they elected to try and use the finality of bankruptcy to really stick it to him. But bankruptcy is very clear that it is not a shield from willful misconduct, gross negligence, or fraud. Defendants as the de facto debtor-in-possession controlled the entire process and they

chose to never disclose the existence of Mintz and his efforts. Instead, they lied. They oversaw the signing of a document declaring that there was no broker and they saw to it to make up a fiction released in the Disclosure Statement.

84. Mintz was not privy to the process of how professional selections were made but was surprised, at least in terms of appearances, to learn that the Liquidating Trustee Edward P. Bond's ("Bond") office is at 347 Mt. Pleasant Avenue, West Orange, NJ 07052 the exact same address as Richard Trenk ("Trenk"), the attorney for the Acquirer, Defendant Semprae. The far more logical geography for an attorney for the debtor, a Charleston, South Carolina-based company, would have been Charlston which was in proximity to Zestra's former headquarters and Crosby's residence. On information and belief, Bond and Trenk knew each other quite well prior to this bankruptcy, and Bond's engagement was not an out-of-the-blue coincidence. This adds support to the declaration that the Acquirer drove the entire process as the de facto debtor-in-possession. Interestingly, in the Disclosure Statement for Debtor's Chapter 11 Plan of Liquidation, Bond's address is given as 405 Northfield Avenue, West Orange, NJ 07052 which is different from the 347 Mount Pleasant Avenue, West Orange, NJ 07052 address Bond gave Mintz in a telephonic conversation or that an interested party would find doing an Internet search. One must assume that Bond used a different address in the Disclosure Statement (and likely the entire proceeding) to skirt appearances of impropriety.

85. Zestra's shareholders, who were demolished not because of wrong assessments about the product's possibilities but rather because of outrageous decisions and behavior by the people they trusted to run the business, have been benefitted had their damages mitigated the best as possible because of Crosby retaining Mintz and Mintz's efforts. But for Mintz getting involved and making the introduction to Defendant New Spring, it's difficult to know where

things would be.  As per NatCity Investments, Inc. ("NatCity"), a banker retained during the bankruptcy process ostensibly by the debtor in possession (discussed more below), NatCity managed a rigorous process and determined defendants' offer was the best.

86.     It was stated in The Disclosure Statement that: "(T)he Debtor retained NatCity Investments, Inc. as investment banker to market the Debtor's assets in search of a higher and better offer.  NatCity contacted 68 entities as potential purchasers of the Debtor's assets, many of whom had been previously contacted by Morgen Evan.  Of the 68 entities, 41 were potential strategic buyers and 27 were potential financial buyers.  NatCity sent confidentiality agreements to six entitites, four strategic and two financial, and three confidentiality agreements were executed (all three with strategic buyers).  The Debtor, with the assistance of NatCity, established a data room for interested parties to conduct due diligence.  NatCity also prepared CD ROMs of the due diligence materials that were sent to parties that executed confidentiality agreements.  Despite some initial interest, there were no bids submitted by the deadline for bidding.  Accordingly, the Debtor did not conduct an auction and moved forward with a sale to Semprae."  Mintz states: (i) either NatCity's efforts were more cosmetic than functional and they were paid substantial money (on information and belief $250,000) for the optics of pursuing the best deal; or (ii) they did as they stated, only validating that much more the caliber of Mintz's targeting of Defendant New Spring (and their wives and associates) in the first instance.

87.     While Mintz is legally educated, he never functioned as a practicing attorney in his career.  Moreover, skills that he once could have honed had atrophied over the many years of disuse.  Mintz was terrified, but he did not have much time or financial resources.  The several firms Mintz met with declined to take the case on without significant retainers and open-ended hourly rates that Mintz could not afford to pay.  Accordingly, Mintz set out on his own.

88.    Despite his fears, Mintz acted immediately, diligently, and formally. Over the next two weeks, Mintz drafted and submitted a detailed letter with supporting emails and other collateral and documentation to all of the parties named in the Disclosure Statement as the parties to notify with responses and objections to the approval of the Disclosure Statement. This package was also filed with the Court to object to the Notice of Hearing to Consider Approval of Disclosure Statement for Debtor's Chapter 11 Plan of Liquidation. Mintz stated in the letter: "I am submitting this letter and some supporting documentation as I am the one who introduced the acquirer after having an agreement with the former CEO Martin Crosby to be compensated upon success and I have been systematically defrauded by the parties regarding the compensation."

89.    In the Disclosure Statement, Mintz also first learned that Defendant Quaker, a firm headed by Defendant Lubert had invested in Defendant Semprae. On information and belief, Mintz states the amount Defendant Quaker invested is $9 million. Mintz has known Defendant Lubert for the same duration he has known Rieger-- approaching 20 years. And Mintz has met with Defendant Lubert at different times over this period including Mintz's introduction of GoldenEye to Defendant Lubert that Mintz feels heavily impacted Defendant Lubert's design of Defendant Independence Capital Partners.

90.    In a series of back and forth communications between Mintz and Defendant Lubert on March 4rth, 2009, Mintz informed the ostensibly unaware Defendant Lubert of the situation. Defendant Lubert claimed ignorance and was brusque in his responses. He emailed Mintz: "you should do what you feel you need to do! I'm not getting involved. I know nothing about the deal."

91.    Mintz states that as of his receipt of the Disclosure Stament and those email communications on March 4rth, Defendant Lubert behaved as if he were unaware that Mintz put

the deal together. In fact, even though Defendant Lubert is the Managing Partner of defendant Quaker, Defendant Lubert did not seem to have any knowledge about Semprae whatsoever. While this unawareness of deal closings by a fund that Defendant Lubert is the Managing Partner of should be of concern to Defendant Quaker's Limited Partners, Mintz states what concerned him was that Defendant Lubert failed miserably in regards to the "now that you know, what are you going to do about it test?"

92.     Mintz emailed Defendant Lubert that he would over-night the same materials to Defendant Lubert that he had sent to the parties named in the Disclosure Statement. And the materials are very clear regarding Mintz's generating the deal. Mintz was appealing to Defendant Lubert to be the voice of reason and the party to say 'we don't conduct business this way'. However, Defendant Lubert never saw fit to respond to the very comprehensive set of materials Mintz had overnighted to him. Basically Defendant Lubert's words, actions, and non-actions demonstrated that Defendant Lubert couldn't care in the least that Mintz was harmed, even though his fund, Defendant Quaker and umbrella organization, Defendant Independent are intimately involved. Defendant Lubert's nonfeasance and complicity indicated to Mintz that Defendant Lubert had zero interest in Mintz's predicament, didn't care one bit about discerning the truth and/or righting a wrong, and that Defendant Lubert felt that if he and his partners had successfully screwed Mintz, his best strategy was to be an ostrich. As discussed below, Defendant Lubert's nonfeasance morphed into significant malfeasance on November 21st, 2009, when Defendant Lubert called Mintz on his cell phone and repeatedly and aggressively threatened Mintz promising that he would destroy him and his reputation if he sued seeking legal redress.

93.     Defendant Lubert's dilemma is that nonfeasance, when there is a duty to act, can

make one an accessory and Mintz knew that. Moreover, Mintz was almost incredulous that good ole boys network was behaving like a white-collared mafia. Mintz had known Defendant Lubert and Rieger for almost 20 years and had introduced an opportunity that they were hoping to make $200 million or more from ($8 million maximum price in bankrupty court plus $9 million invested into the company x 10 times venture capital hoped for return) and yet they were willing to completely stiff him. Moreover, there are all kinds of creative ways to take care of friends. Mintz, on information and belief, suspects that defendants have utilized 'family and friends' rounds and other techniques during initial public offerings to dole out rewards, often times to people not even involved in the specific transaction. So, there was plenty of room, opportunity, and flexibility to take care of Mintz. Mintz declares that Lord Acton's quote on power corrupting and absolute power corrupting absolutely came to mind repeatedly in dealing with these masters of the universe.

94.     On March 10th 2009, Mintz wrote to Trenk ("Trenk") and sent to him the materials that he had sent to those named in the Disclosure Statement as well as to Defendant Lubert and asked Trenk to review the materials as Mintz had been wronged but wanted to settle the matter as positively as possible: "It would be very nice if, within your advocacy, you can be a positive voice of clarity and reason to avoid what I feel will be a costly unpleasantness." Trenk responded perfunctily, negatively, and told Mintz to stick it in his ear. Mintz was forced to proceed with his contesting of the Disclosure Statement.

95.     Mintz in his response to Trenk stated: "You are right, however to be concerned about the negative image stuff. I would be too. Institutional greed, arrogance, and screwing the little guy just aren't popular things anymore. I think this behavior cannot and will not be tolerated by the courts, other partners, and the community at large—it is despicable,

unconscionable, and, yes, fraudulent. Moreover, I'm certain they have played variations of this game over the years, and, if I am forced to move forward, I will seek to join other parties who I suspect have similar grievances... Before sending this communication, I reviewed all prior communications. To this point, I have been generous and' exercised great restraint and forbearance. You and your clients can try to 'misremember and get comfortable with this fiction, but there is lots of documented information as well as information in the public domain that supports everything I've stated (possibly, even a nanny). We are in a period where, for the first time in recent memory, people who lie under oath go to jail. Please look carefully at Marion Jones, Pete Rose, Barry Bonds, Roger Clemens, etc. You need to meet with your clients and get ALL the information so you can advise them about the risks."

96.     The Delaware Bankruptcy Court accepted Mintz's letter and scheduled him for an appearance on Tuesday, March 24th, 2009. Chief Judge Carey was presiding. Mintz presented his situation and Judge Carey said that Mintz had to make a proper motion for allowance of administrative expense if that is what he thought he was entitled to.

97.     Mintz left court that day nervous but pleased that his honesty and diligent efforts had shown some benefits with the Court. He began to draft a Motion for Allowance of Administrative Expense. Mintz states that he hadn't drafted any kind of motion for 20 years and he was very concerned that either in substance or form it would be off in some manner. He tried to be as careful and exacting as he could, and he submitted it to the court.

98.     A very big positive for Mintz was when an investor in one of his other business endeavors helped introduce him to Curtis Crowther of Young Conaway Stargatt & Taylor and Mr. Crowther represented Mintz at the May 21st, 2008 hearing regarding his Motion for Allowance of Administrative Expense.

99.     One of the things that Mintz had naively not expected was how incredibly adversarial everyone was to him when he was presenting the well-documented facts and circumstances.  As the Court ultimately found, "but for" Mintz being retained, the creditors wouldn't have had this outcome and money in the pot.  But, the creditors didn't care about Mintz.  Because of Defendants' fraud and charade, Mintz's appearance was seemingly out of the blue and the creditors were determined to fight for every nickel. Emotionally, this was a continuation of the whole polluted Zestra story.  Here Mintz had done something quietly, successfully, and selflessly and was being punished again for doing so.

100.    The hearing was very adversarial and the different classes of creditors each tried to discredit Mintz.  Mintz was on the witness stand for approximately and hour and a half.  He was exhausted but felt pleased and exonerated when Judge Carey ruled: "I am convinced the record does reflect there was an oral agreement between Mr. Mintz and the Debtor and ... he ... had authority to act on behalf of the Debtor at the time, and that such payment would be made at or after closing based upon ... sales price."

101.    Exhausted, insulted, yet buoyed by the Bankruptcy Court's findings, Mintz tried one final time to, for all intents and purposes, to beg the defendants to do the right thing and not force Mintz to continue to pursue a legal remedy.  And he was very direct and non-secretive.  He let them know that he had prevailed in Bankruptcy Court, that he had everything documented, and that he wanted to set forth and continue to establish his very good faith and behavior in dealing with them: "I'm so glad I presented you with what Rachel has described as "the perfect business storm" opportunity! Actually, I really am   However, the day of reckoning is here.  I have no idea why you

would ever want to harm me—although I'm sure that "screw the broker" is de rigeur and part of your daily fare—but that point of rumination has passed. Your behavior and that of Zev, Glenn Rieger, New Spring Capital, and Ira Lubert and Quaker is creepy, insulting, arrogant, bullying…and illegal. You have defrauded me and have engaged and continue to engage in conspiratorial behavior. While the bankruptcy court seeks finality, it is not an escape from deceit and fraud. Consider this your last clear chance to make amends... Please note that after several good faith efforts to resolve this, I determined that the right first step was to challenge the Disclosure Statement. You forced me to go into Bankruptcy Court and it was time-consuming, expensive, and outrageous. But I did it to clearly, legally begin the process of proper redress. Please read the above finding from Chief Judge Carey CAREFULLY. This statement was made by a learned man who really did not want to find for me…"

102. On November 19, 2009, Defendant Lubert called Mintz on his cell phone to angrily, antagonistically, and threateningly state repeatedly that if Mintz sued he, Defendant Lubert would never settle and that he would do whatever he could and spend whatever he needs to (and he told Mintz that Mintz knows he, Defendant Lubert, has the money to make good on his threat) to ruin Mr. Mintz's reputation and hurt him in whatever way he could. Mr. Mintz states that Defendant Lubert repeated this over and over—no less than seven times during the call and made a statement that he Defendant Lubert had "gone to law school for ten minutes" and "since there's no written agreement, they can screw him". Mintz tried to respond and to explain that Judge Carey found that he was the retained investment banker based on his oral agreement, but Lubert only wanted to threaten and pontificate, not listen.

103.    By analogy, if Defendant Lubert had walked down to a dock and found that his buddies had beaten up and thrown Mintz into the water and Mintz was flailing about clearly in the throes of drowning, and there was a stout boat hook and life preserver within easy reach, and Mintz was pleading please help I'm drowning. Well, rather than extend the helping hook or throw the life preserver, Defendant Lubert metaphorically reversed the hook and with its handle like a spear jabbed Mintz in the head and under the water. Nonfeasance is the nonperformance of an act that a person has agreed or is duty-bound to perform. Malfeasance is the performing of an act that is legally unjustified, harmful, or contrary to law. Defendant Lubert was now guilty of both.

104.    Mintz states that Defendant Lubert has always conducted himself as a bully, as he probably found it was a beneficial extension of what he learned as a former wrestler, but this was way out of bounds. As Defendant Lubert intended, Mintz was rendered scared and uncertain. An interesting nexus was the timing: Defendant Lubert's threats were close in time to the high profile blackmail threats that were made against David Letterman. So two things occurred to Mintz: (i) this situation wasn't that different from that of Letterman—with Letterman, it was pay me or I will damage you; with Mintz and Defendant Lubert, it was refrain from pursuing your legal rights and pursuing your legal remedies including obtaining a well-deserved payment, or I will damage you; and (ii) Mintz realized that by Defendant Lubert making his threats so closely on the heels of the high-profile Letterman scandal, Defendant Lubert demonstrated a different level of haughtiness and feeling above the law. Mintz states this was the private equity version of the infamous Colonel Jessup in *A Few Good Men* pervertedly hollering 'you can't handle the truth' (that defendants had screwed him).

105.    Mintz was nearly scared into submission. But, as he thought about the entirety of the events, he determined that he was a person too. Moreover, he was an honorable person and had done nothing wrong. Mintz states that he thought hard about what Defendant Lubert threatened, thought hard about the Letterman analogy, and did some further research. One of the things Mintz came across was the California Bill of Victim's Rights which stated: "Right not to be threatened or intimidated. If anyone threatens you, call your law enforcement agency to report the threat and contact the prosecutor immediately. It is a crime for anyone to attempt to dissuade or prevent you from…attending or giving testimony at any trial or proceeding authorized by law. It is a felony if any such efforts involve coercion, threats or force, or are done for financial gain." Mintz decided that he had to report Defendant Lubert's threats and to do it in a timely fashion. This had gone beyond anything he could have contemplated and he felt the implications were even bigger than his own circumstance. Society's successful functioning is at some point founded on honor—this cannot be tolerated.

106.    Accordingly, Mr. Mintz filed reports with both the local authorities and the FBI so that the entire episode was properly and timely documented. He was just blown away by the extent of the conspiracy and corruption: defrauded on the front-end, Sergeant Schultzing and ostriching in the middle, and extorted at the back-end. These masters of the universe behaved unconscionably and criminally.

107.    Standard compensation for an investment banker in this type of transaction is 6-10% of aggregate consideration plus warrant coverage. As examples of the range and structures, on information and belief, Mintz states that Laidlaw's agreement called for a fee of 8% of equity with 8% warrant coverage, Zubchevich received 10% commissions as well as warrants for 10%

and Sequence Investment Partners, a Charleston-based Investment bank that Zestra had dealt with, had a success fee of 6% on equity with warrant coverage of 10% of the total deal with an exercise price of 110% of the per share price of this deal.

108.    If one considers Defendant Semprae's commitment, based on performance, to pay up to $8 million as per the Disclosure Statement plus, on information and belief, a total of $10 million that as of this complaint has been invested in Defendant Semprae by defendants, a total of $18M must be recouped before any return is earned.  As venture capital is a game of homeruns and venture capitalists are seeking 10 times returns on every investment so that the portfolio stars offset the portfolio dogs, then using this as a guideline, defendants are hoping that they make at least $180M (10 times $18 million invested) on this transaction.

109.    Options are also a standard portion of this kind of transaction and Mintz offers that the language is frequently: *Warrants.  If an investment, acquisition, or restructuring is completed by an Interested Party* (defined as someone introduced by the banker), *banker shall receive, immediately vested, 10 year warrants to acquire 8% of whatever the Interested Party acquired at the strike price equal to whatever the Interested Party paid in the transaction.  So for example (hypothetically), if an Interested Party acquired 100,000 shares of preferred stock of the Company at $1/share, banker would have the right, over 10 years, to acquire 8,000 shares of preferred stock with the same rights and preferences accorded the Interested Party at $1/share.  This warrant contains full 'anti-dilution' protections to adjust for number of share increases or reductions including the exercise price of the warrant. So, For example, upon a 2-for-1 stock split, the anti-dilution provision adjusts the warrant so that it becomes exercisable for twice as many shares as before, at a strike price that is reduced by one-half.  Banker has the right to a 'cashless exercise' of the options in case of a future merger, acquisition, initial public offering,*

*or other such transaction."* As a gut check, even were Mintz to have been compensated solely with options, even 1% participation in the exit of this potentially very lucrative transaction could be incredibly lucrative…$2 million.

110.   As discussed above, Mintz's base expectation base fee based on the potential aggregate consideration and industry standard compensation formulas (excluding options) was $640,000 (8% x $8 million). But Mintz had taken this on: (i) without any commitment fee or expense reimbursement; (ii) in an emergency context with everything at risk; and (iii) without an exclusive or any other protection. Said differently, Mintz's expectation damages are on the high end of traditional to compensate for his alacrity and assumption of all the risk of getting it done in an all or nothing proposition.

111.   New Jersey Courts do not deny plaintiffs merely because the exact amount of damages is uncertain. Borough of Fort Lee v. Banque Nat'l de Paris. cite=311%20N.J.Super.%20280">311 N.J., 291 (App. Div. 1998); however, the record must support a reasonable estimate of damages, based upon more than mere speculation before a damage award can be affirmed. American Sanitary Sales Co., Inc. v. State, Dep't of Treasury, cite=178%20N.J.Super.%20429">178 N.J. , 435 (App. Div.), certif. denied, (1981). Clearly industry standard formulas are very easy to corroborate as well as examine the other formulas extended to investment bankers who worked with Zestra.

112.   As a direct and proximate result of the defendants' conduct as alleged hereinabove, Plaintiff has suffered an amount to be proven at trial but believed to exceed $1,000,000 plus interest based on expectation damages from the consummation of the successful transaction Mintz initiated plus other general, hedonic, and special pecuniary and non-pecuniary damages.

## SECOND CLAIM FOR RELIEF

### (Bankruptcy Fraud)

113.    Plaintiff hereby re-alleges and incorporates by reference each and every allegation set forth at paragraphs 1 through 112, above, as though fully set forth herein.

114.    Mintz declares and the facts and actions bear out that defendants orchestrated an intentional deception to cleverly and callously freeze out Mintz, simultaneously silenced Crosby—who was already hanging on an emotional thread after presiding over a troubled, vitriolic, hateful period and dealing with the non-stop onslaught from Zubchevich, other shareholders, and creditors—with threats real and implied of financial retribution, and then lied in bankruptcy and hid the materially important existence of Mintz as the banker that introduced the parties as they attempted to pervert the bankruptcy system and use the finality of the process to "launder" their egregious misdeed.

115.    Bankruptcy fraud is a US federal crime that can lead to criminal prosecution under the charge of theft of the goods or services.  The mere non-disclosure of material facts can be a form of misrepresentation where the defendant has concealed a known fact that is material to the transaction, and there is a duty to disclose likely material contingencies. Ibid. See also Baldasarre v. Butler, (Law Div. 1992), aff'd in part, rev'd in part, (1993).  Defendants' deception during the bankruptcy process and post hoc was done for personal gain and intentionally, recklessly, wantonly, maliciously, and unconscionably cheated Mintz out of a well deserved success fee and damaged Mintz prospectively and emotionally.

116.    New Jersey clearly recognizes benefit-of-the-bargain damages in fraud cases. See Lipsit v. Leonard, 285 n.4 (1974); see also Zeliff v. Sabatino, 74 (1954); Gardner v. Rosecliff Realty Co., 10-11 (App. Div. 1956); Correa, supra, 196 N.J. Super. at 277, 284.  In Correa, this

court addressed benefit-of-the-bargain damages, stating: The appropriate measure of damages in a fraud or concealment case is a perplexing problem and has been the source of much litigation and concern. Despite the problem in measuring damages in a fraud case, so long as the amount of the lost benefit can be established by the proofs with sufficient certainty, a court will award damages equal to that which a plaintiff would have received had the representation been true. Gardner, supra, 41 N.J. Super. at 10-11. In Zeliff, supra, 15 N.J. at 74, the Supreme Court addressed benefit-of-the-bargain damages for fraudulent misrepresentation, indicating that "flexibility" and "proximity" must be employed in developing an appropriate measure of damages in a fraud case: The rule governing the measurement of damages in fraud actions should be flexible, and the principles applied in a flexible manner…where the damages under the benefit-of-the-bargain rule are proved with sufficient certainty, that rule will be employed. This is so apparently even where there is "an inescapable but permissible element of speculation involved in estimating ... [the damages] but for the defendant's misconduct." Price, supra, 932 F. 2d at 604. In such cases, the benefit-of-the-bargain rule "attempts to place [the employee] in the position he would have enjoyed had the representations been true."

117.    Perjury, also known as forswearing, is the willful act of swearing a false oath or affirmation to tell the truth, whether spoken or in writing, concerning matters material to a judicial proceeding. That is, the witness falsely promises to tell the truth about matters which affect the outcome of the case. Perjury is considered a serious offense as it can be used to usurp the power of the courts, resulting in miscarriages of justice. The general perjury statute under Federal law defines perjury as a felony and provides for a prison sentence of up to five years. To be convicted of perjury, one must have the intention (mens rea) to commit the act, and to have actually committed the act (actus reus). Defendants easily meet this "knowing" standard.

118.    For guidance, Mintz researched The Federal False Claims Act (31 USC 3729-33) and found that The Federal False Claims Act makes it a crime for any person or organization to knowingly make a false record or file a false claim with the government for payment. "Knowing" can include deliberate or reckless ignorance of facts that make the claim false. (b) Knowing and Knowingly Defined. — For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information— (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

119.    During the bankruptcy process, defendants functioned as the de facto debtor-in-possession and controlled the entire process.  They lent the bankrupt estate money under preferences and orchestrated and conducted the whole process.  They knew everything about Mintz as well as his displeasure; however, they determined to never disclose the existence of Mintz and his efforts.  Instead, they lied.  They signed a document declaring that there was no broker and they saw to it to make up a fictional story released in the Disclosure Statement saying that "Prior to the Petition Date, one of the directors on the Debtor's board contacted Defendant Quaker to try to try to codify the fictional account of how the opportunity first appeared.  But bankruptcy law is very clear that it is not a shield from willful misconduct, gross negligence, or fraud.

120.    As a direct and proximate result of defendants' fraud and deceit and the facts herein alleged, Plaintiff has suffered an amount of general, hedonic, and special pecuniary and non-pecuniary damages to be proven at trial.

### THIRD CLAIM FOR RELIEF

#### (Extortion)

121.    Plaintiff hereby re-alleges and incorporates by reference each and every allegation set forth at paragraphs 1 through 120, above, as though fully set forth herein.

122.    Defendant Lubert's November 21st, 2009, call to Mintz threatening to destroy his reputation and career should he pursue his legal remedies was the back-end of a pattern and practice that was egregiously deliberate, calculated, malicious, and based on all of the events, rendered Mintz so frightened and unsure that he reported the threats to both the police and FBI.

123.    Mr. Mintz states that Defendant Lubert's threats prevented him from sleeping and kept his mind racing all night long, affected his physical well-being, traumatized him, and had a profound impact from the bullying that resulted in back spasms due to stress, and caused ongoing withdrawal and depression (See SEVENTH CLAIM Intentional Infliction of Emotional Distress below).

124.    As a direct and proximate result of defendants' extortion and the facts herein alleged, Plaintiff has suffered an amount of general, hedonic, and special pecuniary and non-pecuniary damages to be proven at trial.

### FOURTH CLAIM FOR RELIEF

#### (Conspiracy)

125.    Plaintiff hereby re-alleges and incorporates by reference each and every allegation set forth at paragraphs 1 through 124, above, as though fully set forth herein.

126.    Civil conspiracy or collusion is an agreement between two or more parties to deprive a third party of legal rights or deceive a third party to obtain an illegal objective.  It is not necessary that the conspirators be involved in all stages of planning or be aware of all details.

Any voluntary agreement and some overt act by one conspirator in furtherance of the plan are the main elements necessary to prove a conspiracy. A conspiracy may exist whether legal means are used to accomplish illegal results, or illegal means used to accomplish something legal.

127. The tort of conspiracy requires there to be knowledge of the relevant circumstances and of the agreement made. Rieger and Defendant Scherl were far more than agents of Defendant New Spring, they were Senior Partners and professional venture capitalists. Defendant Lubert was far more than an agent of Defendant Quaker and Defendant Independence. He is the absolute Grand Poobah of both. They knowingly conspired on the front-end to cut out Mintz. Moreover, by analogy, if someone approached Walt Disney with a script or project, Disney goes through legal convulsive gesticulations to protect itself from being accused of stealing ideas. This situation is the contrapositive. A deal opportunity was brought to a professional deal group that proceeded to do the deal. It is their absolute obligation to make sure that things are in place with the introducing party. If the response is we do this all the time and our motto is screw 'em as they're unlikely to be able to fight back. Well they erred in judgment.

128. At first, Defendant Lubert was an accessory, a person who assisted in the commission of a crime, but who likely did not actually participate in the commission of the crime as a joint principal. The principal is the one whose acts or omissions, accompanied by the relevant *mens rea*, are the most immediate cause of the *actus reus*. If two or more people are directly responsible for the *actus reus*, they can be charged as joint principals. The test to distinguish a joint principal from an accessory is whether the defendant independently contributed to causing the *actus reus* rather than merely giving generalized and or limited help and encouragement. In some jurisdictions, an accessory is distinguished from an accomplice, who normally is present at the crime and participates in some way. An accessory must generally

have knowledge that a crime is being, or will be committed. A person with such knowledge may become an accessory by helping or encouraging the criminal in some way, or simply by failing to report the crime to proper authority. The assistance to the criminal may be of any type, including emotional or financial assistance as well as physical assistance or concealment.

129.    A person who learns of the crime after it is committed and helps the criminal to conceal it, or aids the criminal in escaping, or simply fails to report the crime, is known as an "accessory after the fact".  To be convicted of an accessory charge, the accused must generally be proven to have had actual knowledge that a crime was going to be, or had been, committed. Furthermore, there must be proof that the accessory knew that his or her action, or inaction, was helping the criminals commit the crime, or evade detection, or escape.

130.    Withdrawal is a way that an accessory may escape liability by timely disengaging and communicating his or her intention to the other parties.  If he or she has already taken tangible action, they must take affirmative action to withdraw the aid.  It is not necessary that the crime actually be prevented by his actions; if the withdrawal is done properly, the former accessory will not be liable.

131.    Subterfuge, obfuscation, threatening and silencing Crosby, and spousal shell games, are all embarrassing and illegal.  So too is the Seargent Schultz "I know nothing" feigned post-hoc ignorance routines.  The totality of the circumstances glaringly shows the ole boy network functioning like an Ivy-educated, white collar, mafia who used their fabulously fortunate financial positions and pens as their weapons of choice.  And all of the Defendants demonstrated the outright refusal to take any affirmative action to right an egregious wrong or withdraw in a legal capacity.  Defendant Lubert, as discussed above was at all times complicit and then aggressively brutal.  The back-end threats to destroy Mintz's reputation, particularly in

light of Defendant Lubert's incredible wealth and his penchant for bullying behavior, added likelihood and loathsomeness to the already reprehensible conspiratorial behavior.

132.    As a direct and proximate result of defendants' conspiracy and the facts herein alleged, Plaintiff has suffered an amount of general, hedonic, and special pecuniary and non-pecuniary damages to be proven at trial.

## FIFTH CLAIM FOR RELIEF

### (RICO and Hobbs)

133.    Plaintiff hereby re-alleges and incorporates by reference each and every allegation set forth at paragraphs 1 through 132, above, as though fully set forth herein.

134.    This cause of action arises under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 USC § 1961 *et seq*. The drafters of RICO were very clear that they did not want one set of rules for people whose collars were blue or whose names ended in vowels, and another set for those whose collars are white and have Ivy League diplomas.

135.    Defendants operated cohesively and conspiratorially to function as an association in fact enterprise as per 18 USC § 1961(4). While their primary motive was to consummate the acquisition of the assets of Zestra, a secondary motive and perhaps integral element of the association was collaborating in a shell game to deprive Mintz of his well-earned success fee. On information and belief, some or all of the defendants have interrelated interests above and beyond the Zestra transaction and Defendants have likely and realistically engaged in other similar acts of good ole boy subterfuge to avoid paying other fees or to direct opportunities to each other, other partners, or other friends or associates at the expense of investment bankers, brokers, limited partners or others.

136.    Defendants engaged in a pattern of racketeering activity within the meaning of 18 USC § 1961(5) by committing more than two predicate acts of racketeering activity within the meaning of 18 USC § 1961(1) within this incident and likely and realistically have engaged in similar type dealings during the last 10 years and after the effective date of RICO to avoid paying other fees or to direct opportunities to each other, other partners, or other friends or associates at the expense of investment bankers, brokers, limited partners or others.  At the front-end, defendants knowingly engaged in racketeering activity as defined in Section 1344 relating to financial institution fraud.  §5312 defines financial institution as a private banker, an investment banker, or an investment company.  And defendants also engaged in (bankruptcy) fraud connected with a case under Title 11 by serving as the de facto debtor-in-possession and controlling the entire bankruptcy process and knowingly, maliciously, callously, and importantly materially not only failing to mention Mintz's role in catalyzing the deal and bringing the parties together but also by offensively swearing and committing to writing that there was no broker involved in the transaction knowing that not to be the case at all.  At the back-end, defendants knowingly engaged in racketeering activity as defined in Section 1513 relating to retaliating against a witness, victim, or informant, by extorting Mintz and threatening him with doing whatever it takes to destroy his reputation should he sue and pursue his legal remedies.  Mintz alleges that this pattern contains a sequence of events, that all have the same and common purpose, and that purpose is one of egregiously deliberate, calculated, and malicious, fraud and extortion which constitutes a "pattern of racketeering activity".

137.    Defendants' scheme or artifice to defraud was done to deprive Mintz of his

financial and intangible right of honest services.  According to Chapter 63 Sec. 1346 a "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.  Courts must be careful not to curtail unduly a plaintiff's discovery into alleged wrongdoing, especially where it relates to other alleged victims of the same pattern of racketeering activity or to acts within the exclusive knowledge of the defendant(s).

138.    The fraudulent scheme described included multiple acts of wire fraud under 18 USC § 1343, and therefore multiple acts of racketeering activity, in that in implementing their scheme and artifice to defraud and obtain (not pay out) money or property by means of false or fraudulent pretenses, representations, or promises: (a) upon information and belief, defendants' utilized wires to make fund transfers and the wires are instrumentalities of interstate commerce; and (b) upon information and belief, as an integral part of the fraudulent scheme, defendants spoke with one another by telephone, using wires that are instrumentalities of interstate commerce.

139.    The Hobbs Act, codified at 18 U.S.C. § 1951, prohibits actual or attempted robbery or extortion affecting interstate or foreign commerce.  Section 1951 also proscribes conspiracy to commit robbery or extortion without reference to the conspiracy statute at 18 U.S.C. § 371. Although the Hobbs Act was enacted as a statute to combat racketeering in labor-management disputes, the statute is frequently used in connection with cases involving commercial disputes.

140.    Defendants, jointly and severally, are involved in interstate commerce and Mintz, as indicative of a whole class of bankers, is also involved in interstate commerce.  As a matter of commercial law and honorable society, there is a clear pattern of racketeering, fraudulent conduct, abuse, egregious bullying, and extortion— from threatening Crosby with retribution to

| 52

silence him and eliminate his supporting Mintz or protesting defendants' actions to threatening Mintz with destruction of his reputation should he dare try and protect himself and seek his very-well-deserved compensation.

141.    As a direct and proximate result of defendants' RICO Act and Hobbs Act violations and the facts herein alleged, Plaintiff has suffered an amount of general, hedonic, and special pecuniary and non-pecuniary damages to be proven at trial and respectfully requests judgment of threefold the damages he sustained plus interest, plus the costs of this suit including reasonable attorney's fees.

## SIXTH CLAIM FOR RELIEF

### (Tortious Interference with Prospective Economic Advantage)

142.    Plaintiff hereby re-alleges and incorporates by reference each and every allegation set forth at paragraphs 1 through 141, above, as though fully set forth herein.

143.    As early as the seminal case of *Keeble v. Hickeringill*, (1707) 103 Eng. Rep. 1127, styled as a "trespass on the case", Justice Holt strongly excoriated the tortfeasor and wrote: "where a violent or malicious act is done to a man's occupation, profession, or way of getting a livelihood, there an action lies in all cases."

144.    Credentials, tombstones, references, etc. are always vitally important in business but maybe never more important than in the deal business where the dealmaker is only as good as his or her last deal. Defendants themselves repeatedly demonstrated the importance of deal announcements and tombstones and used them to build rapport and validate competence and proficiency. Accordingly, defendants not only knowingly robbed Mintz of very important assets for going forward and marketing and closing new business opportunities, but also they rubbed

his nose in it by trumpeting how thrilled they are with their "perfect storm" business opportunity (that, according to them poofed out of the atmosphere).

145.    As an example of how important tombstones are thought to be, SSG Capital which is a spin-out from NatCity boasts of the Zestra deal on its website and states: "SSG was retained by Zestra to conduct a sale of the business pursuant to Section 363 of the United States Bankruptcy Code. After managing a rigorous sale process, SSG and Zestra concluded that the offer made by Semprae was indeed the highest and best offer. The sale transaction closed in August 2008."

146.    Although no reputable investment bank will guarantee success, a firm must have a demonstrated record of closing transactions (see e.g. The Accidental Investment Banker: Inside the Decade That Transformed Wall Street by Jonathan A. Knee "investment banking credentials complete with attractive logos of companies previously represented" are vital indicia of competence and success p.4). This Cinderella tale of Zestra's rock bottom rags to hopefully potential lubrication riches should have been an incredible arrow in Mintz's and Enhancement's PR and promotional quiver, but he was not able to use it. Moreover, he was denied the ability to even use Crosby as a strong reference. In point of fact, rather than being a positive, just mentioning the situation brought in such negativity that it was beyond useless—it was harmful to even mention as it cast negative light on Mintz. Accordingly, Mintz was robbed of very valuable going forward/building the business assets.

147.    The issue of credentials, tombstones, and success is an ongoing one. So, for example, on December 23rd, 2009, a prospective new client of Mintz emailed: "Hal, Steve They want to see your bios, resumes, success stories, happy customer endorsements. Can you provide a package?". In this case, as in many others, the ability to trumpet the Zestra success

story would have been very helpful.  But even more, Mintz was unable to even talk about his excellent performance and even use Crosby as a reference despite Crosby being eternally grateful to Mintz and referring to his efforts as "Spot on" and writing to Mintz "You're my hero!".  Mintz had far more than a reasonable expectation of economic advantage that was lost as a direct result of defendants' malicious conduct.

148.   Aside from the credential itself, Mintz as an entrepreneur was robbed of the financial fuel to drive Enhancement's business.  Instead of the positive reinforcement of cashflow from a job well done that would allow Mintz to build his businesses, he was saddled with unconscionably caused heartache and financial and emotional enervation as he was forced to divert already strapped financial and emotional resources to righting this wrong instead of building Enhancement's business.

149    As a direct and proximate result of defendants' conduct and the facts herein alleged, Plaintiff's going forward business opportunities were significantly hampered and Mintz lost substantial future earnings to be proven at trial.

## SEVENTH CLAIM FOR RELIEF

(Intentional Infliction of Emotional Distress)

150.   Plaintiff hereby re-alleges and incorporates by reference each and every allegation set forth at paragraphs 1 through 149, above, as though fully set forth herein.

151.   Mintz states that he was made to feel like he was on the fictional Shutter Island and all his efforts were a delusional dream.  He was unable to be proud and share what really was a very significant and successful achievement—he had selflessly dug in and helped create a win-win with a very troubled company—with almost anyone other than those very closest to him.  If anyone had Googled the situation, he or she would have found another group taking credit for

the transaction and sporting the tombstone on their website. So rather than possessing the feeling of pride and the positive reinforcement that comes from a job well done, Mintz was rendered the embarassed victim of fraudulent, extortionish bullies who had the gall to gloat. Mintz was embarassed by his predicament, afraid to even protect himself because of the extortionist threats, unable to sleep, and frequently paralyzed with anger and emotion during the days effectively enervating, destracting, and defocusing him from other important activities which invariably so disappointed him that it only served to continue and deepen the cycle.

152.    What these Masters of the universe did was unconscionable…Mintz feels criminal. As part of Mintz's research into what he strongly believes is defendants' criminality, he became captivated by the, in some cases, extreme workings of California's Three Strike Law where some repeat offenders were given life sentences for stealing trivial itemas including a donut, a bag of Tillamook Sharp Cheddar Cheese, and a slice of pepperoni pizza. Mintz queries if he can identify 2 other cases where defendants knowingly stole fees (which likely would have paid for life-long supplies of donuts, Tillamook sharp cheddar cheese, or pizza slices) should defendents be committed to life long sentences as per the Three Strike Law. Certainly the act of stealing significant success fees from successful intermediaries causes them far more psychological, emotional, spiritual, and financial harm and damage, than was sustained by the victims of the pepperoni pizza caper. Interestingly, in the case of the pepperoni pizza, to the Larsons (the parents of the kids who had their slice of pizza stolen), a life sentence seemed like a lot, but they also wanted the person who robbed their children to face consequences. "I really did feel like the kids were victimized. They were terrorized there for a few minutes," recalled Keith Larson, a former police officer and military prosecutor.

153.    Mintz was continuously traumatized and disturbed by his predicament but

unwilling to incur the cost or stigma of going to a therapist. Instead, he tried to cope by reading and studying the effects that bullying and the ensuing depression have on their victims. The experience of being bullied is an almost universal sort of thing. Mintz found that bullying is composed of selfish, narcissistic, sadistic, destructive, and often violent acts perpetrated upon victims who do not in any way, shape, or form deserve to be treated in that manner. Ring-leader bullies are behaving as though the emotional and physical health of their victims is not important or is at least less important than their own desire for the thrill of aggression and dominance. Bullies and narcissists treat other people as though they are objects either to be used, or discarded, and use their victims for purposes of self-gratification and aggrandizement and then discard them. The experience of being bullied can end up causing lasting damage to victims. This is both self-evident, and also supported by an increasing body of research. It is not necessary to be physically harmed in order to suffer lasting harm. Words and gestures are quite enough. In fact, the old saying, "Sticks and stones may break my bones but names will never harm me" is more or less exactly backwards. For the most part, physical damage sustained in a fist fight heals readily, especially damage that is sustained during the resilient childhood years. What is far more difficult to mend is the primary wound that bullying victims suffer which is damage to their self-concepts, to their identities. Bullying is an attempt to instill fear and self-loathing. Being the repetitive target of bullying damages ones ability to view him or herself as a desirable, capable, and effective individual. When one is forced to contemplate his or her relative lack of control over the bullying process, one is being set up for learned helplessness (e.g., where one comes to believe that he can't do anything to change his ugly situation even if that isn't true), which in turn sets one up for hopelessness and depression. In other words, it is rather easy for bullying victims to note that they have been beaten up and then to start thinking of

themselves as weak, no-good, worthless, pathetic, and incompetent. These are the sorts of thoughts that lead to depression, or, if they are combined with revenge fantasies, to anger and rage feelings.

154.    Mintz sustained personal and professional depression as a result of defendants' conduct.  He lived each day with a combination of anger combined with listlessness and was disappointed in himself for his weakness.  Frequently, he had severe lower back pain and jolting back spasms due to stress.  In work, depressed individuals are liable to be slow and less productive, to be indecisive and uncertain, and to make more mistakes, and Mintz experienced all of these effects. Mintz also states that he tended to avoid friends and social gatherings, and was unable to derive satisfaction from hobbies and leisure interests.

155.    Mintz observed that many of the things he was studying to try and cope, he was actually experiencing including: chronic fatigue, headaches/pains behind his eyes, and sleeping problems especially waking up at ungodly hours and being unable to fall back asleep as his mind and heart started racing.  And while Mintz is prone to it, he was experiencing even more severe joint pain that served to amplify the negative emotions he already was feeling.

156.    Defendants intentionally inflicted extreme emotional distress upon Plaintiff. Defendants' conduct was unreasonable and outrageous and exceeds the bounds usually tolerated by decent society, and was done willfully, maliciously and deliberately with the intent to cause Plaintiff severe mental and emotional anguish, distress, depression, humiliation, and loss of enjoyment of life, or was done with reckless indifference to the likelihood that such behavior would cause such severe emotional distress and with utter disregard for the consequences of such actions.

157.    Defendants' actions were undertaken willfully, wantonly, maliciously and in

reckless disregard for Plaintiff's rights, and as a direct and proximate result thereof, Plaintiff suffered emotional damage in a total amount to be proven at trial.

## EIGHTH CLAIM FOR RELIEF

### (Proximate Causation Opportunity Loss)

158.    Plaintiff hereby re-alleges and incorporates by reference each and every allegation set forth at paragraphs 1 through 157, above, as though fully set forth herein.

159.    Mintz is a self-employed entrepreneur. He is not sheltered from financial calamities by a cushy salary or by cushy management fees such as many of the Defendants receive before ever performing a successful day's work. Mintz's business, Enhancement Associates, aside from opportunistically taking on investment banking endeavors also is the platform for two businesses Mintz and Enhancement are incubating.

160.    Mintz states that unless the public policy is for clearly defrauded parties to do nothing, than it was very clear that a proximate cause of defendants' egregious wrongdoing was that Mintz would have to divert resources including time, money, and personal and professional resources away from building his life and businesses and toward being a private attorney general for himself in the first instance but in the longer-term for other persons who are openly, wantonly, and maliciously defrauded by perpetrators so wealthy they feel above the law and who also calculate that the costs to pursue redress are so onerous that their victims will never be able to fight back. And honor is a vital foundation of a functioning society. Thinkers ranging from Montesquieu to Steven Pinker have remarked upon the mindset needed for a culture of honour. Mintz, on information and belief, believes defendants have unjustly deprived other parties of their rightful compensation betting that they would be able to cram it down and they would be unlikely to fight back.

161.    Economists tend to value most everything based upon either an opportunity cost or replacement cost perspective.  With an opportunity cost approach, value is based on what an individual sacrificed to obtain a set of goods, services or assets. Mintz states that he lost two years being forced to fight back and obtain what he is legally entitled to and his efforts are and will be vitally important to generations ahead particularly as we watch the divide between the haves and have nots deepen leading toward the decimation of the middle class and the unbridled greed and corruption of Wall Street that sucks money out of the system.

162.    As a direct and proximate result of defendants' conduct and the facts herein alleged, Plaintiff's other business opportunities were significantly hampered and Mintz lost substantial time and substantial future earnings to be proven at trial.

## NINTH CLAIM FOR RELIEF

### (Unjust Enrichment)

163.    Plaintiff hereby re-alleges and incorporates by reference each and every allegation set forth at paragraphs 1 through 162, above, as though fully set forth herein.

164.    Mintz states that net, net, he teed this opportunity up for defendants and kept at it until they finally understood the extent of the opportunity and pursued it!   But for Mintz's introduction and efforts, they would not be here today.

165.    Yes, there were problems with Zestra, but nearly all of them could be dealt with through a bankruptcy.  And there was lots of good stuff: (i) $9 million and countless years had gone into the development of Zestra; (ii) an expensive, high-quality, multi-million dollar, FDA-type clinical trial had already been completed with results supporting the product's safety and efficacy;  (iii) the product had incredible distribution, all things considered, with placement on the shelves of approximately 40,000 stores including those of most of the major chains; (iv)

Zestra was starting to receive national recognition with high-profile exposure on TV shows such as the Rachael Ray show; (v) Johnson & Johnson was making almost daily moves indicating its strong belief in the market as well as arguably its need to have a more effective product to keep up; and (vi) when it really came down to it, the Company was all product—it had achieved all of the above with a very small, malleable infrastructure.

166.    Coming at it from the other direction, defendants all must feel they have been greatly benefitted by Mintz's introduction; otherwise, why do the deal at all!  In these decremental times, it is vitally important that we take a step back and reassess everything—venture capital included.  A strong case can be made that venture capital is all about the front-end investment.  From this perspective, being introduced to the right opportunity by a smart and trusted party is more than half of the battle.  For those who have sat at the table as the buyer, it really is surprisingly easy to write checks when you have the money.  It's all the other stuff that's difficult.

167.    Mintz declares Defendants are embarrassingly, greedy opportunists and if someone had introduced an opportunity that he thought had so much merit and potential that his wife and her partner would abandon their multi-million dollar consulting practice to pursue it full-time, he would have sent the intermediary thank you notes, flowers, and, of course, been delighted to pay his or her fee.  This is beyond a written agreement, this is what is right, just, and fair.  It also involves professionalism, good faith, and character.  Defendants' malfeasance and nonfeasance was always unconscionable and demonstrates a haughty "I am above this" approach but it is even more unconscionable in these very trying times.  Mintz has everything documented he introduced the deal, shepherded it, and it got done!

168.    Unjust enrichment has three elements.  First, the plaintiff must have provided the

defendant with something of value while expecting compensation in return.  Mintz did so in spades.  Second, the defendant must have acknowledged, accepted, and benefited from whatever the plaintiff provided.  They did and they gloat about it.  Third, the plaintiff must show that it would be inequitable or unconscionable for the defendant to enjoy the benefit of the plaintiff's actions without paying for it.  Certainly, Chief Judge Carey found that a terrible unfairness had been perpetrated.

169.    Defendants' actions were undertaken willfully, wantonly, maliciously and in reckless disregard for Plaintiff's rights.  The law protects persons from thieves and other overreachers unjustly enriching themselves at another's expense.  Wherefore, Plaintiff respectfully demands defendants be compelled to compensate him for their failure to make equitable payment for a benefit witch they voluntarily accepted from him.

### TENTH CLAIM FOR RELIEF

(Punitive Damages)

170.    Plaintiff hereby re-alleges and incorporates by reference each and every allegation set forth at paragraphs 1 through 169, above, as though fully set forth herein.

171.    Defendants' actions were evil-minded, egregious, and evidenced wanton disregard toward Mintz, and defendants acted with oppression, fraud, and malice.   Mintz has demonstrated that defendants intentionally lied as the de facto debtor-in-possession during the bankruptcy process; colluded and conspired as they threatened and silenced Crosby; colluded and conspired as they attempted to disguise, conceal, and launder their malicious deeds; intentionally disregarded Mintz's own career aspirations as well as his concerns, hopes, and fears; and threatened him with destruction of his reputation should he pursue his legal remedies. They did this all knowing how damaging it was to Mintz.  This is particularly reprehensible in

light of the enormous wealth of defendants.  All of the defendants make millions of dollars each year and defendant Lubert, on information and belief, makes well upward of $40 million every year and possesses a net worth of a half a billion dollars.  Defendant New Spring manages hundreds of millions of dollars from state, university, and corporate pensions and high net worth individuals, and Defendant Independence manages billions of dollars from state, university, and corporate pensions and high net worth individuals.  Moreover, the facts support a premeditated scheme to defraud as well as violations of both criminal and regulatory laws.  This is far beyond even the contemplation of BMW of N. Am., Inc. v. Gore, , 576, , 1599, , 827 (1996) that recognized that "infliction of economic injury, especially when done intentionally through affirmative acts of misconduct, or when the target is financially vulnerable, can warrant a substantial penalty".  Punitive damages are designed to require wrongdoers to pay an amount of money that is sufficient to punish the defendant(s) for egregious conduct and to deter defendant(s) from misconduct in the future.  Punitive damages are also designed to serve as an example to discourage anyone else from committing similar acts.  The evidence here is clear and convincing and defendants are so wealthy and haughty that a slap on the hand means nothing.  In this case, there is no question the bloody glove fits and was fur-lined and made from the finest private equity leather.

172.    Defendants' egregious conduct demonstrates their perversion of The Golden Rule. In their world of perceived absolute power, they don't believe in the ethic of reciprocity and doing unto others what you would like others to do unto you.  Instead, they believe, practice, and flaunt: he who has the gold…rules!

173.    Defendants' actions were undertaken willfully, wantonly, maliciously and in reckless disregard for Plaintiff's rights, therefore Plaintiff seeks exemplary and punitive damages

in an amount sufficient to deter said Defendants and others from similar future wrongful and egregious conduct.

## ELEVENTH CLAIM FOR RELIEF

### (Res Judicata)

174.   Plaintiff hereby re-alleges and incorporates by reference each and every allegation set forth at paragraphs 1 through 173, above, as though fully set forth herein.

175.   Upon receiving the Disclosure Statement, Mintz was appalled and snapped into action.  He determined that the right first step was to challenge the Disclosure Statement.  He was compelled to petition the Bankruptcy Court and creditors' commitees and it was time-consuming, expensive, and outrageous.  But Mintz did it to clearly, legally begin the process of proper redress.

176.   Mintz was forced to litigate and prove his formal retention as an investment banker on behalf of debtor and it was adversarial and saddened Mintz immensely after having performed such good and successful work on behalf of the debtor.  The one ray of bright light was that very important final judgment on the merits by Chief Justice Carey:  *"I am convinced the record does reflect there was an oral agreement between Mr. Mintz and the Debtor and ... he ... had authority to act on behalf of the Debtor at the time, and that such payment would be made at or after closing based upon ... sales price."* Honorable Kevin J. Carey, United States Bankruptcy Judge, ZTBK, Inc., f/k/a  Zestra Laboratories, Bankrupcy #08-11313.

177.   Defendants are barred from relitigating Chief Judge Carey's finding and this is completely consistent with the overriding concepts of judicial economy, consistency, and finality, as the determination that Mintz was retained under an oral agreement was: (i) fully and

| 64

fairly litigated in the bankruptcy court; (ii) the finding was essential to the judgment; (iii) the

parties were in adversarial positions; and (iv) the fact finder acted in a judicial capacity.

### TWELFTH CLAIM FOR RELIEF

(Attorney's Fees)

178.    Plaintiff hereby re-alleges and incorporates by reference each and every allegation

set forth at paragraphs 1 through 174, above, as though fully set forth herein.

179.    Mintz is aware that courts are often reluctant to award attorney fees to victorious

pro se litigants.  But Mintz states to the extent the reluctance is founded upon the antiquated

supposition that American justice is relatively inexpensive and simple and litigants ought to be

able to handle cases themselves, at a minimum of cost, this is radically outdated.  Sure the

rugged individualistic spirit of the pioneers is a wonderful ideal, but in truth, in an era demarked

by giant corporations and the emergence of a new class of robber barons, this rule actually

functions as a virtual silencer of the the little guy.  Society needs to recognize how difficult it is

to defend oneself against tyrannies—in fact this is more in keeping with the history of our great

nation—and it is reverse jingoism and antithetical to even its strong democratic principles, that

the United States is one of the only countries that denies pro se fees as a general rule.  Mintz

states that he has spent approximately a thousand hours in trying to seek redress to right this

unconscionable wrong.  He also has retained counsel at various points in the process.

180.    Wherefore, Plaintiff requests payment of attorney's fees in the amount of

$350,000.

### THIRTEENTH CLAIM FOR RELIEF

(Declaratory and Injunctive Relief)

181.    Plaintiff hereby re-alleges and incorporates by reference each and every allegation

| 65

set forth at paragraphs 1 through 180, above, as though fully set forth herein.

182.    Plaintiff's complaint specifically details a chain of lying, concealment, extortion and a complete abrogation of any concepts of honesty, fair play, or good faith.  Moreover, the facts support a conclusion that the defendants feel they are individually and collectively above the law.  In sync with their entire course of conduct, Plaintiff strongly believes that even a successful outcome for him will not compel defendants to act responsibly and make payment.

Accordingly, Plaintiff respectfully requests that an equitable lien be placed on the assets of Semprae that bars the sale of the company, any disposition of the assets of the company, or any recapitalization that involves new financing pending the resolution of this matter.   The goal of the equitable lien is to correct the great injustice and wrongful acts that have occurred, by placing a lien on the wrongdoers' property, in favor of the party harmed by the wrongdoers' actions.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff requests the following relief against Defendants, and each of them, as follows:

1.    For an award of general, hedonic, special pecuniary and non-pecuniary, and consequential and/or continuing damages from the defendants, and each of them, plus prejudgment interest thereon, according to proof or by operation of law;

2.    For an award of exemplary and punitive damages to the extent allowed by law and in an amount according to proof;

3.    For a finding of RICO and Hobbs violations and an award of threefold the damages sustained, plus interest, plus the costs of this suit including reasonable attorney's fees;

| 66

4.      For preliminary and permanent injunctive and declaratory relief pending final resolution of the case;

5.      For attorneys' fees and costs of suit herein pursuant to statute or as otherwise may be allowed by law; and,

6.      For such other relief as this Court may deem just and proper.


## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury on all issues triable by right to a jury.


Dated this 23rd day of June, 2010


Harold P. Mintz (Pro Se)


By:_____
               Harold P. Mintz